Patricia B. TAYLOR, Plaintiff–Appellee,

v.

FIRST UNION CORPORATION OF SOUTH CAROLINA, formerly Southern Bancorporation, Inc.; First Union Corporation, Defendants–Appellants.

No. 88–2503.

United States Court of Appeals, Fourth Circuit.

Argued June 9, 1988.

Decided Sept. 22, 1988.

Rehearing and Rehearing In Banc Denied Oct. 21, 1988.

John Thompson Allred, Charlotte, N.C. (Kenneth S. Broun, J. Anthony Penry, Petree, Stockton & Robinson, Winston–Salem, N.C., O.G. Calhoun, William M. Grant, Jr., Haynsworth, Marion, McKay & Guerard, Greenville, S.C., Francis C. Clark, Legal Div., First Union Corp., Winston–Salem, N.C., on brief), for defendants-appellants.

John Patrick Freeman, Columbia, S.C., J. Kendall Few, Greenville, S.C., for plaintiff-appellee.

Before RUSSELL and WILKINSON, Circuit Judges, and NIEMEYER, United States District Judge for the District of Maryland, sitting by designation.

WILKINSON, Circuit Judge:

In February 1984, plaintiff Patricia Taylor and her husband, Bennie Taylor, sold

their stock in Southern Bancorporation, Inc. to First Union Corporation for $18 a share. In September 1985, Southern and First Union entered into a merger agreement, and First Union offered to purchase all outstanding stock in Southern for $33 a share. Plaintiff filed suit against Southern and First Union alleging violations of § 10(b) of the Securities Exchange Act of 1934 and breach of fiduciary duty in connection with defendants' failure to disclose their merger discussions and their conduct surrounding the purchase of her stock. A jury returned a verdict in favor of plaintiff on both the state and federal claims and awarded her damages based on the difference between her selling price and the later acquisition price of the Southern stock.

Because § 10(b) imposed no obligation on defendants to disclose highly tentative merger discussions prior to plaintiff's sale of her stock and because defendants' conduct did not constitute deception in connection with the sale of stock or a breach of any fiduciary duty owed to plaintiff, we reverse and remand for entry of judgment in favor of defendants.

## I.

Southern Bancorporation (Southern) was a South Carolina bank holding company that owned all of the common stock of Southern Bank & Trust Co. and World Acceptance Corp. Plaintiff, Patricia Taylor, and her husband, Bennie Taylor, owned 4.9% of the stock in Southern. In February 1984, Bennie Taylor was the Chief Executive Officer of World Acceptance and a member of the board of directors and executive committee of Southern. Bennie Taylor underwent surgery in March of 1983 which left him a paraplegic and resulted in serious emotional complications.

On January 11, 1984, representatives of First Union, a North Carolina bank holding company, met with representatives of Southern to discuss the possibility of the two companies developing a "relationship." Bennie Taylor was not present at this meeting. The evidence indicates that First Union raised the possibility of a merger with Southern in the event interstate banking

became legal. First Union also expressed an interest in acquiring 4.99% of Southern's stock. Southern's board of directors met on January 31, 1984. Bennie Taylor was present at that meeting. After the board meeting, Southern's executive committee approved First Union's acquisition of Southern's stock. First Union then began acquiring stock on the market at the prevailing market price of $16 per share.

On February 6, 1984, a special executive committee of Southern's board sought Bennie Taylor's resignation, allegedly because his deteriorating physical and mental condition made him unable to fulfill his responsibilities to the company, prompting the resignation of three senior officers and executives of World Acceptance. When Bennie Taylor refused to resign, he was terminated. Taylor apparently indicated at that time that he intended to sell his stock in Southern, and he subsequently retained an attorney to negotiate a sale. On February 8, 1984, Southern sent a letter to Taylor offering to pay his salary and benefits through December 31, 1984 if Taylor would agree to resign all offices and directorships at Southern and World Acceptance, to sell his stock in Southern to the company for fair market value, and to release Southern and World Acceptance from all claims arising from his employment and termination. The letter indicated that if Taylor did not accept the offer by February 19, 1984, his salary and all benefits would terminate on February 29, 1984.

Bennie Taylor subsequently offered to sell his stock to Southern for $18 per share, approximately $2 per share above market value. Southern declined to purchase the stock at that price and Taylor's attorney subsequently negotiated a sale of the stock to First Union for $18 per share. On February 28, 1984, Bennie Taylor executed a settlement memorandum prepared by Southern stating that he would sell all stock in Southern owned directly or indirectly by him to First Union for $18 per share. This agreement anticipated as well the sale of the stock owned by plaintiff, Patricia Taylor. Plaintiff was persuaded

by Bennie Taylor and his attorney to sell her stock to First Union.

In June 1985, the Supreme Court, in *Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System*, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), held that interstate banking was constitutional. Subsequent state enabling legislation authorized the merger of North Carolina and South Carolina banks as of January 1, 1986. On September 15, 1985, Southern's president met with representatives of First Union to discuss a proposed merger. An agreement was negotiated authorizing First Union to purchase all of Southern's common stock for $33 per share. Southern's executive committee recommended acceptance of First Union's offer on September 20, 1985. The boards of Southern and First Union subsequently approved the merger and the merger took place, effective April 1, 1986.

Patricia Taylor filed suit in the United States District Court for the District of South Carolina. Her husband, Bennie Taylor, subsequently filed a companion suit on an apparently similar theory. Bennie Taylor's suit has been stayed pending the outcome of this appeal. Patricia Taylor's complaint alleged that Southern and First Union had conspired to withhold from her and her husband information concerning the proposed merger between the two companies in order to acquire their stock at less than its true value. This, plaintiff claims, violated § 10(b) of the Securities Exchange Act and breached the fiduciary duty owed to her by defendants. The action resulted in a mistrial on October 12, 1987, and was retried before a jury on November 16, 1987. The jury returned a verdict against both defendants on both claims in the amount of $165,975 plus interest and costs. Defendants' motion for judgment n.o.v. or for a new trial was denied and defendants appeal.

## II.

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder makes it unlawful for any person

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. 240.10b–5; *see* 15 U.S.C. § 78j(b).

We hold, as a matter of law, that plaintiff's allegations failed to state a claim under any prong of Rule 10b–5.

### A.

◼ Plaintiff contends that First Union and Southern violated Rule 10b–5 by failing to disclose that, at their January 11, 1984 meeting, they agreed to establish a relationship, described as similar to "pinning" as that term was used socially thirty years ago, and agreed in principle to merge when interstate banking became permissible. We disagree. To be actionable under Rule 10b–5(b), a statement or omission must be both material and misleading. *See Basic, Inc. v. Levinson*, —— U.S. ——, 108 S.Ct. 978, 986–88, 99 L.Ed.2d 194 (1988); *Parsons v. Hornblower & Weeks–Hemphill, Noyes*, 447 F.Supp. 482, 489–90 (M.D. N.C.1977), *aff'd*, 571 F.2d 203 (4th Cir. 1978). Because their silence was neither material nor misleading, First Union and Southern were under no obligation to disclose to the Taylors their January 11, 1984 discussions of the possibility of a future merger.

The Supreme Court has recognized that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic*, 108 S.Ct. at 987 n. 17; *see Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 431 (7th Cir. 1987) ("a law designed to prevent frauds on investors tolerates silence that yields benefits for investors as a group"). Rule 10b–5 imposes such a duty to disclose only when silence would make other statements mis-

leading or false. *Parsons,* 447 F.Supp. at 490; *Wessel v. Buhler,* 437 F.2d 279, 283 (9th Cir.1971). Plaintiff has failed to identify any statement made misleading by the defendants' nondisclosure of their merger discussions. There is no allegation that defendants had previously denied the possibility of a merger at some future time. In fact, in its 1980 annual report, Southern was identified as a potential acquisition target should interstate banking become legal.

■ In addition to not being deceptive, the omission complained of here was not material. In the proxy solicitation context, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Basic,* 108 S.Ct. at 983. The materiality of merger discussions depends on the surrounding facts and circumstances. *Basic,* 108 S.Ct. at 987–88. Merger negotiations in *Basic* had progressed to a stage well beyond that presented here and the prospect of a merger there was far more concrete. The Federal Trade Commission had removed regulatory barriers to Basic's merger with Combustion Engineering in 1976. During the next two years Basic and Combustion engaged in meetings, discussions, and negotiations concerning a future merger. *Id.* at 981. The Sixth Circuit noted that attorneys had prepared analyses and evaluations for use in the merger negotiations and investment bankers had been engaged to facilitate the merger. *Levinson v. Basic, Inc.,* 786 F.2d 741, 743–45 (6th Cir.1986), *vacated and remanded,* —— U.S. ——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In that time, in response to heavy trading in its stock, Basic issued three public denials of any knowledge of merger discussions. *Basic,* 108 S.Ct. at 981. Even on these facts, the Supreme Court refused to hold that disclosure was required and instead remanded the case for reconsideration of the materiality question. *Id.* at 988.

In contrast to the circumstances of *Basic,* the evidence indicates that the discussions at issue here were preliminary, contingent, and speculative. At best, the merger discussions culminated in a vague "agreement" to establish a relationship. There was no agreement as to the price or structure of the deal. While, after *Basic,* this alone is not dispositive of the question of materiality, it is certainly not irrelevant to the totality of the circumstances test articulated in that case. Furthermore, neither the factual nor the legal predicates for a merger were in place. There is no evidence of board resolutions, actual negotiations, or instructions to investment bankers to facilitate a merger. *See Basic,* 108 S.Ct. at 987. A merger between First Union and Southern was contingent on events beyond the control of the parties. At the time First Union purchased plaintiff's stock, the Supreme Court had yet to rule on the constitutionality of interstate banking, and no merger could take place until enabling legislation was enacted both in North Carolina and South Carolina. The evidence also suggests that First Union sought unsuccessfully to acquire either of two other South Carolina banks, South Carolina National Bank and C & S of South Carolina, before merging with Southern.

■ In sum, any "pinning" relationship between First Union and Southern at the time of the purchase of plaintiff's stock was of a fickle and changeable character. Those in business routinely discuss and exchange information on matters which may or may not eventuate in some future agreement. Not every such business conversation gives rise to legal obligations. We recognize, of course, the unique significance of a merger in the life of a corporation and do not hold that the high mortality rate of proposed mergers absolves management of all duty to disclose. *See Basic,* 108 S.Ct. at 987; *SEC v. Geon Industries, Inc.,* 531 F.2d 39, 47–48 (2d Cir.1976). The element of materiality, required by the express terms of Rule 10b–5, serves, however, to define the limits of disclosure under federal securities law. *See TSC Industries,* 426 U.S. at 448–49, 96 S.Ct. at 2131–32. The materiality of information concerning a proposed merger is directly related to the likelihood the merger will be accomplished; the more tentative the dis-

cussions the less useful such information will be to a reasonable investor in reaching a decision. Information of speculative and tentative discussions is of dubious and marginal significance to that decision. To hold otherwise would result in endless and bewildering guesses as to the need for disclosure, operate as a deterrent to the legitimate conduct of corporate operations, and threaten to "bury the shareholders in an avalanche of trivial information"; the very perils that the limit on disclosure imposed by the materiality requirement serves to avoid. *See id.; Susquehanna Corp. v. Pan American Sulphur Co.*, 423 F.2d 1075, 1085–86 (5th Cir.1970).

### B.

█ Plaintiff's claim that First Union and Southern violated Rule 10b–5 by employing a "device, scheme, or artifice to defraud," and by engaging in an "act, practice, or course of business which operate[d] ... as a fraud or deceit upon any person" is likewise without merit.

Claims for violations of § 10(b) that do not involve a material misrepresentation or nondisclosure must include some element of deception. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473–77, 97 S.Ct. 1292, 1300–03, 51 L.Ed.2d 480 (1977). The district court concluded that there was "sufficient evidence of deception by Defendants to satisfy this rule." In addition to the nondisclosure of the "pinning agreement," the district court pointed to evidence indicating that Southern lied to plaintiff's husband about the purpose of the meeting at which the company sought his resignation, that Southern threatened to terminate Bennie Taylor's benefits unless he agreed to sell his stock, that First Union's broker misrepresented the identity of his principal until Bennie Taylor committed to a sales price of $18 per share, and that Southern knew but did not disclose that a member of its board had expressed an interest in purchasing the Taylors' stock.

The district court, however, did not address the additional requirement of Rule 10b–5, that the scheme, artifice, fraud, or deceit complained of must occur "in connection with the purchase or sale of [a] security." Defendants' conduct, however characterized, cannot fairly be said to have been "in connection with" the stock sale. *Hunt v. Robinson*, 852 F.2d 786, 787 (4th Cir. 1988); *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 194 (3rd Cir.1976).

An examination of the separate points relied upon by the district court supports the conclusion that the controversy here related primarily to the unpleasant circumstances surrounding Bennie Taylor's termination rather than to any claim cognizable under the federal securities laws. The alleged acts of deception here most directly involve the circumstances of that termination and are only tangentially and incidentally related to the sale of plaintiff's stock.

Taking the inferences, as we must, in favor of the prevailing party below, any misrepresentations concerning the purpose of the meeting at which Taylor was terminated were plainly not in connection with the stock sale, but rather, in connection with the discharge. As for Southern's alleged failure to disclose that a member of its board had expressed an interest in purchasing the Taylors' stock, we note that § 10b–5 imposes on a prospective purchaser no obligation to disclose to a seller the identity of every other potentially interested party. The so called "threat" to terminate Taylor's benefits, involved nothing more than negotiations over the terms and conditions of his departure and involved no *fraud* in connection with the sale of a security. Southern's letter to Taylor, rather than relating to disability benefits which all concede were vested, spoke in addition to benefits generally in terms of salary, perquisites, office space, secretarial assistance, and matters which would have to be addressed in any discussion of the terms of a departure. There is, in fact, little to distinguish it from customary negotiations over an officer's or director's severance arrangements. Finally, any misrepresentation by the broker of the identity of his principal is insufficient to transform the character of this entire controversy into one of fraud under § 10(b). There was no

misrepresentation of the value of the stock. While Bennie Taylor claims that he was too far committed to the deal at the time, he did learn prior to any consumation of the sale that First Union was the purchaser. Moreover, the broker apparently misinformed Taylor that he could not accept the offer because "his principal was out on a yacht fishing" only after Taylor, over his attorney's advice not to commit, quoted a price of $18 per share. The plaintiff was not misled in her investment decision by the nondisclosure of material information nor was she deceived about the value of the stock or the potential value of the company. Thus, the requisite nexus between the sale and any fraud or deception is simply lacking.

■ While not dispositive of plaintiff's claim under § 10(b), it is, nonetheless, significant that Bennie Taylor was a sophisticated investor and a member of the board of directors of Southern. Bennie Taylor was not unknowledgeable about the company and the banking industry and was aware of the implications of interstate banking for the company. The evidence indicates that he attended the director's meeting at which First Union's investment in Southern was approved. He knew that Southern presented an attractive acquisition target should interstate banking become legal. *See, e.g., Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978). Although he was in poor health, Bennie Taylor negotiated the stock sale through an attorney who testified that he advised caution in the sale and informed Taylor of the possibility of a First Union–Southern merger.

■ The fundamental purpose of the Securities Exchange Act is to implement a "philosophy of full disclosure," *Santa Fe Industries*, 430 U.S. at 477–78, 97 S.Ct. at 1302–03, by ensuring that the reasonable investor receives the information necessary to make informed investment decisions. *See Hunt*, 852 F.2d at 787; *O'Brien v. Continental Illinois Nat. Bank & Trust*, 593 F.2d 54, 60 (7th Cir.1979). Federal securities law was not intended to provide a federal forum for every intracorporate

squabble or to substitute for the more general state claims of wrongful discharge, conspiracy, fraud, or duress which may, of course, be litigated in state court. The securities law does not authorize and its goals are not furthered by the scrutiny of the background of every factional struggle among directors or shareholders simply because the sale of stock happens to have taken place. This action is brought by Patricia Taylor in her capacity as a shareholder of Southern, and whatever state law actions Bennie Taylor may seek to bring for wrongful discharge or breach of fiduciary duty in his capacity as director are, of course, not before us.

### III.

■ The evidence does not support the conclusion that, under South Carolina law, defendants breached any fiduciary duty owed to plaintiff, as a stockholder in Southern.

Under South Carolina law, "officers and directors of a corporation stand in a fiduciary relationship to the individual stockholders and in every instance must make a full disclosure of all relevant facts when purchasing shares of stock from a stockholder." *Jacobson v. Yaschik*, 249 S.C. 577, 155 S.E.2d 601, 605 (1967). The fiduciary obligation established by South Carolina law is quite specific. This fiduciary duty runs from the officers and directors of a corporation to the shareholders of their corporation. This relationship requires full disclosure of all material information when the officer or director seeks to acquire the company's stock from a shareholder. *See id.* 155 S.E.2d at 605–06; *Black v. Simpson*, 94 S.C. 312, 77 S.E. 1023, 1025 (1913); *see also* S.C.Code Ann. § 33–13–150 (1976). As such, the extent of the fiduciary obligation is both settled and predictable, and not subject to speculative expansion whenever some third party is involved.

■ Here, we do not address the case of a corporate officer or director (or even the corporation itself) purchasing the stock of one of its own shareholders. Rather we have one corporation, First Union, purchas-

ing the stock of a second corporation, Southern, from a shareholder of that corporation. Where companies have complied with the requirements of § 10(b), we decline to interpret state corporate law to find a conspiracy in every business interaction. Similarly, we decline to extend South Carolina law to impose a fiduciary obligation on a corporation with respect to the purchase of its shareholder's stock by a second corporation, or on a corporation purchasing stock from the shareholder of another corporation, simply because the two corporations have had some prior business dealings or negotiations.

## IV.

The securities markets are not meant to be risk-free. Patricia Taylor sold her stock in 1984 for $18 a share, $2 a share above its fair market value. She now seeks, and the jury has awarded her, damages in excess of $165,000, the difference between the price she received from First Union and the enhanced value of the securities two years hence.

A verdict based on these facts undermines the proper operation of the securities markets. Sales of securities remain market transactions. The seller receives cash for the stock, thereby ridding herself of the risk of a decrease in its value and simultaneously assuming the risk that its value might increase. The vital congressional purpose in protecting investors against uninformed decision-making is not intended to simultaneously eliminate all risk that the stock may increase by providing a cause of action against the corporation in that eventuality. Neither federal securities law nor the South Carolina law of fiduciary duty provides a remedy for a shareholder who, in hindsight, simply wishes that she had held onto her stock.

The judgment of the district court is REVERSED.