929 F.2d 694
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Morton SEIDMAN, John E. Cooney, Ronald A. Seff, Trena T.
Brown, Philip Greene, Thomas W. Piechocki, Patricia
Piechocki, Douglas Schiffman, David Posner, K.G. Rao, Janet
M. Ward, Richard J. Brauner, Michael Sherman, Martin J.
Sherman, James W. Ricketts, Taylor W. Thomas, Barbara
Panariella, Plaintiffs-Appellants,
v.
Henry C. McDONALD, Anthony R. Morgenthau, James D. Locke,
Mt. Vernon Place Limited Partnership, Morgenthau &
Associates, Incorporated, James D. Locke Development
Corporation, Mormac, Ltd., Bridge Energy Corporation,
Defendants-Appellees.
 No. 90-2362.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 4, 1990.
Decided April 8, 1991.
As Amended May 6, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Edward S. Northrop, Senior District Judge. (CA-88-1424-N)
 Philip Fertik, Beigel & Sandler, Ltd., Chicago, Ill. (Argued), for appellants; Herbert Beigel, Beigel & Sandler, Ltd., Chicago, Ill., on brief.
 William James Murphy, Murphy & McDaniel, Baltimore, Md., for appellees.
 D.Md.
 AFFIRMED.
 Before DONALD RUSSELL and NIEMEYER, Circuit Judges, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 NIEMEYER, Circuit Judge:
 
 
 1
 Seventeen investors, who had purchased limited partnership shares in Mt. Vernon Place Limited Partnership, sued the partnership, three general partners, and four corporations that provided services to the partnership, alleging that the investors had been defrauded when they purchased their shares and that the defendants violated Sec. 10(b) of the Securities Exchange Act of 1934, Secs. 12(2) and 17(a) of the Securities Act of 1933, and related state common law claims. The limited partnership had been formed to acquire, develop and lease real estate in a historic district of Baltimore, Maryland and to generate tax benefits for its limited partners. The district court granted the defendants' motion for summary judgment on all federal securities law counts and dismissed without prejudice the pendent state law counts. While the complaint alleged a broad array of misrepresentations and breaches, the investors limit their challenge on appeal to two points. First, they argue that the offering materials were misleading in providing a market value appraisal of the property based on comparative sales and in failing to include a value based on anticipated revenues. Second, they contend that the offering materials misrepresented the obligation of the general partners to cover operating deficits. For the reasons that follow, we reject both challenges and affirm.
 
 
 2
 * In July 1984 Henry C. McDonald, Anthony R. Morgenthau, and James D. Locke formed the Mt. Vernon Place Limited Partnership, whose purpose was "to acquire, hold, rehabilitate, develop, operate, lease and sell" several buildings in the Mt. Vernon area of Baltimore, Maryland. J.A. at 44. The Mt. Vernon area has been designated a historic district, entitling investors in the partnership to claim a share in a 25% investment tax credit for certain qualified rehabilitation expenses. The investment tax credit is available, however, only if the partnership holds the property for five years.
 
 
 3
 In July 1985, McDonald, Morgenthau, and Locke, the general partners of the partnership, circulated an offering memorandum and financial forecasts, which described in detail the numerous aspects of the limited partnership. The offering memorandum indicated that the partnership intended "to rehabilitate the Property into 30 residential units, thereafter converting the units into condominiums, leasing them to residential tenants and then selling the Property at some time after five years." J.A. at 44. The offering provided for fifty partnership shares, to be offered at $40,000 each. In addition to the $2 million to be obtained from the investors, the offering described the partnership's construction loan of $2.9 million, obtained from the Gibraltar Building and Loan Association, Inc. The funds from the individual investors and Gibraltar were expected to cover all costs for five years, anticipated to total $3,562,635, and projected operating deficits, estimated to be $1,337,365.
 
 
 4
 The seventeen plaintiffs purchased shares in 1985 pursuant to the offering by making an initial payment of $7,140 per share and executing promissory notes obligating them to pay five additional installments for the remainder of the $40,000 cost per share. The installment payments were due on January 3 of each year beginning in 1986.
 
 
 5
 Soon after the offering closed in August 1985, the partnership ran into financial difficulty. Delays in construction and a sluggish market for leasing the residential units resulted in higher-than-foreseen operating deficits. By December 1987, the partnership had made only one payment of $50,000 on the loan from Gibraltar. Consequently, Gibraltar sought to foreclose on the partnership property.
 
 
 6
 In order to avoid foreclosure and a loss of the investment, the general partners negotiated a restructuring of the loan agreement with Gibraltar. The restructuring required the partnership to sell individual condominiums immediately rather than holding all of the units for five years, as originally contemplated. These sales, of course, would have adverse tax consequences for the investors, who stood to lose at least part of their share of the investment tax credit, which was conditioned on holding the property for five years. The restructuring arrangement also called for the investors to make their January 1988 payment under the promissory notes, but it anticipated that the 1989 and 1990 installments might not be necessary because of the acceleration of sales. A substantial number of the investors, however, including most of the plaintiffs, failed to make the January 1988 installment payment. When the partnership notified these individuals that they were delinquent, this lawsuit ensued.
 
 
 7
 The complaint, which described a number of specific investment risks that allegedly had not been adequately disclosed to investors, alleged violations of Sec. 10(b) of the Securities Exchange Act of 1934, Sec. 17(a) of the Securities Act of 1933 and Sec. 12(2) of the Securities Act of 1933, and pendent state common law claims of fraud, negligence, and breach of fiduciary duty. The claims based on a violation of Sec. 17(a) of the Securities Act of 1933 were dismissed from the case following our decision in Newcome v. Esrey, 862 F.2d 1099 (4th Cir.1988), where we held that Sec. 17(a) does not imply a private cause of action. In response to the defendants' motion for summary judgment filed with respect to the remaining claims, the plaintiffs narrowed the focus of their complaint to two specific instances where the plaintiffs were allegedly misled on a material issue.[1] The first concerns the proper appraisal value of the Mt. Vernon property, and the second relates to an "Operating Deficit Guaranty Loan Agreement" and the defendants' description of that guaranty in the offering memorandum.
 
 
 8
 The only support for plaintiffs' contentions that the offering was misleading on the two points was an affidavit of a financial consultant, Brian Greenman, president of the New Yorkbased Greenman Capital Corporation. Greenman opined that the appraisal value stated in the offering memorandum, which was based on sales of comparable property in the area, did not accurately reflect the true value of the property for investment purposes. He believed that the appraisal should have included a discussion of value based on anticipated revenues from the property, which would have revealed a property value significantly lower than the appraisal described in the offering memorandum. Under this socalled "capitalization of earnings" method, Greenman concluded, "the property had virtually no value because income was negative even without deducting amortization and depreciation and even including the considerable tax benefits." J.A. at 319.
 
 
 9
 On the second point, Greenman stated that the offering memorandum should have disclosed that the general partners would have no economic incentive to lend money to the partnership if the operating deficits exceeded a certain level, and that the investors would have no reasonable method by which they could compel the general partners to cover unexpectedly high deficits.
 
 
 10
 The magistrate judge, to whom the motions were referred, recommended that the defendants' motion for summary judgment be granted on the claims of federal securities fraud and that the pendent state law claims be dismissed without prejudice. The district court adopted the magistrate judge's report and recommendation, and this appeal followed.
 
 II
 
 11
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), protects investors from dishonest practices associated with the purchase or sale of securities. Pursuant to its authority under Sec. 10(b), the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful for any person, in connection with the purchase or sale of a security, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. Sec. 240.10b-5(b).
 
 
 12
 In order to establish liability under Sec. 10(b), a plaintiff must show that a statement or an omission was both material and misleading. Taylor v. First Union Corp. of South Carolina, 857 F.2d 240, 243 (4th Cir.1988), cert. denied, 489 U.S. 1080 (1989). The defendant must have acted with intent to deceive or defraud, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976), and in the case of an affirmative misrepresentation, the plaintiff must demonstrate that he relied on the false statement. Harris v. Union Elec. Co., 787 F.2d 355, 366 (8th Cir.), cert. denied, 479 U.S. 823 (1986). When the alleged deception involves a failure to disclose, however, reliance may be presumed from proof of materiality of the omitted fact. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972). But absent a duty to disclose, silence is not misleading under Sec. 10(b). Taylor, 857 F.2d at 243. A duty to disclose arises "only when silence would make other statements misleading or false." Id.
 
 
 13
 Section 12(2) of the Securities Act of 1933 protects purchasers of securities from misrepresentations in the offering or sale of securities and contains essentially the same language as that of Rule 10b-5(b). 15 U.S.C. Sec. 771(2). Unlike Sec. 10(b), liability under Sec. 12(2) can be imposed for negligent conduct, see Baker, Watts & Co. v. Miles & Stockbridge, 876 F.2d 1101, 1105 (4th Cir.1989), and a showing of personal reliance by the plaintiff is not necessary. Adalman v. Baker, Watts & Co., 807 F.2d 359, 373 (4th Cir.1986). The misstatement or omission must be material, however, as under Sec. 10(b). Johns Hopkins University v. Hutton, 422 F.2d 1124, 1128-29 (4th Cir.1970).
 
 
 14
 The test for whether an omitted fact is "material" under the securities laws is whether there is a substantial likelihood that the omitted fact "would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), and expressly adopting the TSC Industries formulation for the Sec. 10(b) context); Johns Hopkins University, 422 F.2d at 1128-89 (under Sec. 12(2), a fact is material if a reasonable investor would have attached importance to it); see also Kademian v. Ladish Co., 792 F.2d 614, 622-23 (7th Cir.1986) (TSC Industries formulation applied to, among other federal securities fraud claims, a Sec. 12(2) claim). The issue of materiality is resolved by applying the law to the underlying objective facts, and, because the facts are viewed from the standpoint of the ubiquitous "reasonable person," resolution of the issue is peculiarly one for the trier of fact. TSC Industries, 426 U.S. at 450. In appropriate cases, however, summary judgment may be granted. See Johns Hopkins University, 422 F.2d at 1129.
 
 III
 
 15
 The plaintiffs contend that the defendants violated the prohibitions contained in Sec. 10(b) and Sec. 12(2) by including in the offering memorandum an appraisal of the property which was based on comparative sales and which significantly overstated the property's investment value and by failing to include an appraisal value based on a "capitalization of earnings" approach. According to the plaintiffs' expert, Brian Greenman, under a "capitalization of earnings" approach, the property value is based on anticipated revenues, which are "capitalized into present value using a rate based on financial risk, inflation and a real return on investment. Earnings or income are then divided by the selected capitalization rate to determine present value." J.A. at 318. The plaintiffs estimate that such an appraisal would have revealed a property value of $2.97 million, which is about $670,000 less than the comparative sales appraisal, and over $770,000 less than the predicted costs of the project.
 
 
 16
 The "capitalization of earnings" approach, the plaintiffs assert, most accurately reflects the property's merit as an investment. An appraisal made on this basis would have indicated whether the projected costs would be matched by expected revenue from leases, and it therefore would have indicated whether foreclosure was a likely possibility in the following five years, the period for which the property had to be held in order to reap all of the investment tax credit. The plaintiffs argue that had they known the true investment value of the property, based on the "capitalization of earnings" approach, they would not have invested in the limited partnership. Thus, the plaintiffs' argument with respect to the adequacy of disclosure of appraisal values has three aspects: (1) the appraisal actually listed in the offering memorandum was materially misleading because it overstated the true investment value of the property; (2) the defendants failed to include a material matter, namely the true investment value, calculated using the "capitalization of earnings" approach; and (3) the failure to include a "capitalization of earnings" appraisal rendered misleading the appraisal that was described in the offering memorandum. These points will be addressed in order.
 
 
 17
 There is no evidence that the appraisal actually listed in the offering memorandum was "an untrue statement of material fact"[2] in the sense that it did not accurately reflect that which it purported to be--a value based on sales of comparable property. Moreover, because this argument focuses on an affirmative statement, the plaintiffs must demonstrate under Sec. 10(b) that they actually relied on the statement. Harris, 787 F.2d at 366. Yet there is no evidence that any of the plaintiffs ever relied on this appraisal when making the decision whether to invest in the limited partnership. Potential investors in the limited partnership were encouraged to review the appraisal report, which had not been included with the offering memorandum, but which was available for inspection. J.A. at 135. None of the plaintiffs took this opportunity. For these reasons, the appraisal actually described in the offering memorandum cannot form the basis for liability.
 
 
 18
 As for the alleged failure to disclose an alternative appraisal, based on the "capitalization of earnings" approach, the plaintiffs need not demonstrate actual reliance if the alternative appraisal would have been an important factor to the investment decision of a reasonable investor. Affiliated Ute Citizens, 406 U.S. at 153-54. No appraisal using the "capitalization of earnings" approach was made, and therefore the issue is not whether it should have been disclosed, but whether defendants were required to develop the information for inclusion in the offering memorandum.
 
 
 19
 The value of the investment which was disclosed had three distinct aspects. The first was based on the ability of the project to generate rents in an amount sufficient to carry the project. The second was the value of the 25% investment tax credit that was available for rehabilitation projects in a historic district. The third was the prospect of a profit on the sale of the property after its retention for at least five years. The third aspect of value, the future potential for a profit, was a matter on which no one could, nor did, render a meaningful opinion because of the uncertainties of any economy. The focus, therefore, of the factual data contained in the offering related most intensely on the other two aspects.
 
 
 20
 The offering materials were extensive and provided numerous projections of rental income and cost. They revealed an analysis of rents being obtained in the vincinity and expected rents for the subject property in its rehabilitated state. They also projected all aspects of costs for the five year period. The success of the project, however, in being able to have rents adequately cover the necessary costs was dependent on the timing of the income and the expenses. If the construction work involved in rehabilitation were delayed more than expected, income would correspondingly be delayed. Expenses in that circumstance would mount without setoff, and interest would increase. Moreover, the most attractive aspect of the investment, the significant tax credit, would in some respect depend on the success of the cash flow projections. Accordingly, the offering memorandum was devoted mostly to aspects affecting an adequate cash flow.
 
 
 21
 Because the success or failure of the investment depended on cash flow from rents and not on a sale of the property, the sales value of the property was substantially irrelevant. Whether the property had a lesser or greater sales value had no bearing on whether it could be rented as expected or on whether the rehabilitation could be completed for the costs projected. The incidental disclosure in the offering memorandum of an appraisal of the property was a single reference to the appraisal where the history of the land and improvements was described. That appraisal had been obtained for the purpose of obtaining the construction loan from Gibraltar Savings and Loan.
 
 
 22
 That the merits and risks of the investment were dependent on the cash flow and on the tax benefits is not disputed. And the risks attendant to these factors were well disclosed. The offering memorandum explained that "[t]here can be no assurance that the Projections will accurately project the operations of the Partnership, in that such Projections are based on factors such as rental and vacancy rates which are to a large extent determined by market forces." J.A. at 71. The offering memorandum illuminated the risky nature of the investment by noting that the partnership was subject to the normal risks of owning income-producing real property, including, inter alia, "changes in supply or demand as a result of competition; ... inability or unwillingness of tenants to pay any rent increase; future enactment of rent control laws; and the inability to attract a sufficient number of tenants." J.A. at 74. Additionally, the offering memorandum explained the risks of litigation and of being a new business, J.A. at 78, and the various tax risks associated with the investment. J.A. at 79-84.
 
 
 23
 Because of the nature of the project and its investment value, it is readily apparent that the disclosure of any appraisal, particularly one that had not been made, was not needed to inform plaintiffs of the importance of rental income to the investment, the changing nature of the market place with respect to rental income, construction costs, or the other attendant risks. Therefore the failure to include an appraisal based on a "capitalization of earnings" is not information that "under all the circumstances, ... would have assumed actual significance in the deliberations of the reasonable [investor]." TSC Industries, 426 U.S. at 449.
 
 
 24
 Finally, the failure to include an appraisal based on a "capitalization of earnings" approach did not make misleading the appraisal that was disclosed. A perusal of the actual appraisal report would have clearly indicated to the investors that it was made for the purpose of obtaining a construction loan and was based on sales of comparable property in the area. The failure to include an appraisal based on different factors did not imply that the "market value" appraisal was the only method for valuating the property, or that it was somehow defective. The defendants, therefore, violated no duty by failing to include an appraisal using a "capitalization of earnings" approach. See Taylor, 857 F.2d at 243-44 (duty to disclose arises if silence makes statements misleading or false). Absent such a duty, no liability can be imposed.
 
 
 25
 The failure of the defendants, therefore, to include an alternative appraisal value in the circumstances of this case is not a sufficient basis for imposing liability under either Sec. 10(b) or Sec. 12(2).
 
 IV
 
 26
 The plaintiffs also argue that the defendants misled them into believing that the defendants would assume all of the risk that the financial projections may have been wrong. The alleged misrepresentation allegedly arises from the gloss given by the defendants to the "Operating Deficit Guaranty Loan Agreement."
 
 
 27
 Under the Guaranty, which was attached to the offering memorandum as an exhibit, the general partners agreed to loan funds to the limited partnership if necessary "to meet the expenses of operating or maintaining the property and/or the operation of the business of the Partnership, not including depreciation or amortization." J.A. at 325. The offering memorandum further explained that
 
 
 28
 [t]he Partnership could require additional funds for operations if the operating deficits are larger than projected. In this regard, it should be noted that the General Partners have agreed to loan funds to the Partnership under the Operating Deficit Guaranty Loan Agreement.... However, in the event the Partnership is unable to obtain adequate additional funds from acceleration of payments under the Investor Promissory Notes or by borrowing funds from the General Partners under the Operating Deficit Guaranty Loan Agreement or other sources, the Partnership could default under its loan agreement with Gibraltar.
 
 
 29
 J.A. at 71 (emphasis added).
 
 
 30
 The plaintiffs contend that "the clear implication" of the discussion of operating deficits within the offering memorandum is that the limited partnership would be able to borrow funds as needed from the general partners to avoid a default on the loan from Gibraltar. In spite of the cautionary language highlighted above, the plaintiffs transform this "clear implication" into a promise by the defendants to ensure that the partnership would not default on the loan. Then they argue that the promise was illusory and thus misleading, because the defendants had no intention of covering all "cash flow requirements," such as the loan payments. The plaintiffs rely on McMahan & Co. v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir.1990), for the proposition that even literally accurate statements "can become, through their context and manner of presentation, devices which mislead investors."
 
 
 31
 We do not find the plaintiffs' argument to be convincing. The offering memorandum clearly stated that the limited partnership could default on the loan if it was unable to obtain sufficient funds from the general partners or from other sources to cover unexpected operating deficits. J.A. at 71. The general partners did in fact advance funds to the partnership. But at no point does the offering memorandum create the impression that the general partners would continue to advance funds to cover unexpected expenses regardless of the economic circumstances and the state of progress achieved with the rehabilitation of the property. Moreover, the guaranty itself gives no indication that the general partners agreed to cover the partnership's obligation under the loan from Gibraltar.
 
 
 32
 The Second Circuit noted in McMahan & Co., supra, that "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." 900 F.2d at 579. The information disclosed by the defendants in this case, relating to the general partners' guaranty agreement and the partnership's operating deficits, adequately and accurately informed investors of the possibility of default and the risky nature of the investment. As we noted in Taylor, 857 F.2d at 247, "[t]he securities markets are not meant to be risk-free." The information provided by the defendants in the offering materials made this abundantly obvious. The defendants' stated intentions to cover some, but certainly not all, operating deficits were not misleading, and there was, therefore, no misrepresentation and hence no violation of either Sec. 10(b) or Sec. 12(2).
 
 
 33
 For the foregoing reasons, the judgment of the district court is
 
 
 34
 AFFIRMED.
 
 
 35
 DONALD RUSSELL, Circuit Judge and JAMES H. MICHAEL, JR., District Judge, join.
 
 
 
 [1]
 The plaintiffs also charged the defendants with engaging in a "Ponzi" scheme (a scheme by which early investors are paid off with money paid by later investors to encourage yet more and bigger investments, named after the 1920's swindler, Charles A. Ponzi), which they allege doomed the investment from its inception, and with not adequately disclosing all of the fees related to services performed. J.A. at 339. These issues were not supported by any evidence, see J.A. at 344-45, and the plaintiffs have not argued them on appeal
 
 
 [2]
 15 U.S.C. Sec. 771(2); 17 C.F.R. Sec. 240.10b-5(b)