**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 16-2163**

_____

MAGUIRE FINANCIAL, LP,

　　　　Movant – Appellant,

and

LEONARD ASH, Individually and on Behalf of All Others Similarly Situated,

　　　　Plaintiff,

and

CLAY LESLIE; PAUL E. MOORE,

　　　　　Movants,

v.

POWERSECURE INTERNATIONAL, INC.; SIDNEY HINTON,

　　　　Defendants – Appellees,

and

CHRISTOPHER T. HUTTER,

　　　　　Defendant.

_____

Appeal from the United States District Court for the Eastern District of North Carolina, at Greenville.  James C. Dever III, Chief District Judge.  (4:14-cv-00092-D)

_____

Argued: September 15, 2017 Decided: November 15, 2017

Before WILKINSON, DUNCAN, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Wilkinson and Judge Thacker joined.

**ARGUED:** Charles J. Piven, BROWER PIVEN, Stevenson, Maryland, for Appellant. Gregory Lewis Watts, WILSON SONSINI GOODRICH & ROSATI, Seattle, Washington, for Appellees. **ON BRIEF:** Michael A. Ostrander, WILSON & RATLEDGE, PLLC, Raleigh, North Carolina; David A.P. Brower, Richard H. Weiss, BROWER PIVEN, New York, New York, for Appellant. Lee M. Whitman, Tobias S. Hampson, WYRICK ROBBINS YATES & PONTON LLP, Raleigh, North Carolina; Barry M. Kaplan, WILSON SONSINI GOODRICH & ROSATI, Seattle, Washington, for Appellees.

DUNCAN, Circuit Judge:

Plaintiff-Appellant Maguire Financial, LP ("Maguire Financial") appeals the district court's dismissal of its amended complaint in this securities fraud class action. Maguire Financial argues that the district court erred in holding that a statement by the CEO of PowerSecure International, Inc. ("PowerSecure"), to securities analysts that the company had secured a "contract renewal" could not form the basis for liability under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), *see* 15 U.S.C. § 78(b), and Rule 10b-5, *see* 17 C.F.R. § 240.10b-5, because the amended complaint failed to adequately allege scienter. For the reasons that follow, we affirm.

I.

A.

PowerSecure provides utility and energy technologies to electric utilities and their customers.[1] Sidney Hinton, PowerSecure's president and CEO, has three decades of experience in the energy industry. Hinton certified PowerSecure's financial reports and signed its annual and quarterly SEC filings.

PowerSecure has three operating segments: Interactive Distributed Generation ("DG"), Energy Efficiency ("EE"), and Utility Infrastructure ("UI"). Its UI products and

---

[1] Because this appeal follows a motion to dismiss, we recite the facts as alleged by Appellant. *Partington v. Am. Int'l Speciality Lines Ins. Co.*, 443 F.3d 334, 336 n.1 (4th Cir. 2006).

3

services include transmission and distribution system construction and maintenance, installation of advanced metering and efficient lighting, and emergency storm restoration. The UI segment generated 41% of PowerSecure's 2013 revenue. During the class period, Florida Power & Light ("FP&L") was the largest electric utility in Florida and had a three-year contract with PowerSecure for the West Palm Beach area that was soon to expire. FP&L's contract accounted for approximately 10% of PowerSecure's UI revenue and about 4.1% of its total revenue.

PowerSecure issued a press release on June 6, 2013, announcing that it had "added approximately $75 million to its revenue backlog, including approximately $49 million from a renewed and expanded three year utility infrastructure (UI) award to serve one of the nation's largest investor owned utilities (IOUs)." J.A. 412. On August 7, 2013, Hinton stated during a conference call and live webcast for securities analysts and investors that PowerSecure was "blessed to announce securing a $49 million three-year contract renewal, both the renewal and expansion with one of the largest investor [owned] utilities in the country." J.A. 412. Investment analysts reacted positively to the announcement, and the next day PowerSecure's common stock rose more than 10% to close at $17.71 per share.

On August 16, 2013, PowerSecure sold 2.3 million shares at $16 per share, and Hinton sold 200,000 shares from his personal holdings at the same price. Hinton also transferred to his wife approximately $2.5 million of his PowerSecure stock in December 2013 and February 2014 as part of a divorce settlement.

4

On May 7, 2014, PowerSecure surprised the market by reporting a first quarter loss of almost $4.3 million as its cost of sales increased 34% and operating expenses grew by 39%. Hinton stated on a conference call with analysts that same day that FP&L had "changed the geographies we were serving" from West Palm Beach to Ft. Myers and that "we probably underestimated the negativity [and] the complexity of basically starting from scratch in a new territory." J.A. 417–18. Since it was not feasible for PowerSecure's employees in West Palm Beach to commute 125 miles to Ft. Myers to fulfill the new contract, they left the company to work for other contractors. Consequently, PowerSecure had to hire and train new workers in Ft. Myers at significant expense. Although the new contract offered PowerSecure more work, its higher costs reduced short-term profitability. The next day, numerous analysts slashed their ratings and price targets for PowerSecure, and its stock price fell more than 62%.

B.

On May 22, 2014, Leonard C. Ash filed a securities class action suit against PowerSecure, Hinton, and Christopher T. Hutter (PowerSecure's Chief Financial Officer). On October 10, 2014, the district court granted a motion to consolidate Ash's case with two other cases and named Maguire Financial as lead plaintiff. On December 29, 2014, the plaintiffs filed a consolidated securities class action suit. It alleged that PowerSecure's share price was artificially inflated after Hinton's August 7, 2013, statement that PowerSecure had obtained a "contract renewal," because PowerSecure

5

knew then that its West Palm Beach contract had not been extended, and it had instead been awarded a less profitable contract in Ft. Myers.

Maguire Financial sought to impose liability based on twenty-six allegedly materially false or misleading statements made by defendants. On September 15, 2015, the district court granted PowerSecure's motion to dismiss. The district court concluded that twenty-five of the statements were not materially false or misleading. The twenty-sixth statement was that of Hinton on August 7, 2013, noting that the company was "blessed to announce securing a $49 million three-year contract renewal, both the renewal and expansion with one of the largest investor [owned] utilities in the country." The district court found that Maguire Financial had adequately alleged that the twenty-sixth statement was materially misleading, but that the complaint failed to adequately plead scienter. It therefore granted leave to amend.

The amended complaint sought to impose liability based only on Hinton's August 7, 2013, statement.[2] On September 14, 2016, the district court granted PowerSecure's motion to dismiss the amended complaint, finding that Maguire Financial again failed to adequately plead scienter. It concluded that neither the allegation that Hinton had made a material misrepresentation nor a holistic view of the facts were sufficient. This appeal followed.

II.

---

[2] The amended complaint did not name Hutter as a defendant.

6

We review de novo the district court's dismissal for failure to state a claim. *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

The Exchange Act ensures that companies disclose to investors the information needed to make informed investment decisions. *See Taylor v. First Union Corp. of S.C.*, 857 F.2d 240, 246 (4th Cir. 1988). Maguire Financial's claims arise under § 10(b) of the Exchange Act, which makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Section 10(b) is implemented by Rule 10b-5, which makes it unlawful "[t]o employ any device, scheme or artifice to defraud[;] [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or[;] [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Section 10(b) provides an implied private right of action, and the plaintiff in such an action "must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

Ordinarily, a plaintiff need only make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, Rule 9(b) creates an exception to this liberal pleading standard and requires that "[i]n alleging

7

fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading requirement serves to protect defendants' reputations from baseless accusations, eliminate meritless suits brought only to extract a settlement, discourage fishing expeditions, and provide defendants with enough information about a plaintiff's allegations to mount a defense. *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009).

"[T]he inconsistent application and interpretation of Rule 9(b) and other abuses in securities cases prompted Congress to enact the PSLRA [Private Securities Litigation Reform Act]." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 171 (4th Cir. 2007). While "meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions," these actions, "if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA was enacted by Congress "[a]s a check against abusive litigation by private parties," *id.*, lest every rosy corporate prognostication generate potential liability.

The PSLRA clarifies the heightened pleading standard that applies to securities fraud actions. It requires that the complaint in a private securities fraud action "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA does not define "a strong inference." However, the Supreme Court instructs courts to "accept all factual allegations in the

8

complaint as true[;]" "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[;]" and "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, . . . take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23.

To establish scienter, the "required state of mind" in a § 10(b) action, a plaintiff must prove that the "defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014) (quoting *Tellabs*, 551 U.S. at 319). However, "[a]t the pleading stage, alleging either intentional or severely reckless conduct is sufficient." *Id.* Recklessness is "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 621 (4th Cir. 1999)). "Such 'severe recklessness' is, in essence, 'a slightly lesser species of intentional misconduct.'" *Id.* at 344 (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)). The court must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. To survive a motion to dismiss in a § 10(b) complaint, "the inference of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

Our task is straightforward. We "must analyze the factual allegations raised by the plaintiffs, as well as other evidence in the record, and determine what plausible

9

inferences we can draw from them." *Pub. Empls.' Ret.*, 551 F.3d at 312. To survive a motion to dismiss, the facts alleged must give rise to a strong inference that Hinton intentionally or recklessly deceived, manipulated, or defrauded investors. Reversal is appropriate "only if we find the inference that [the defendants] acted with scienter 'at least as compelling' as the inference that the defendants lacked the required mental state." *Id.*

We conclude that Maguire Financial has not adequately alleged scienter as required by § 10(b) of the Exchange Act, Rule 10b-5, and the PSLRA. Accordingly, we affirm the district court's dismissal of the amended complaint.

III.

Maguire Financial's amended complaint alleges that "Hinton was privy to confidential and proprietary information concerning PowerSecure" and that "it is impossible that Hinton did not know the contract was ***not*** a renewal but, instead, was an entirely new contract for a different geographic area" that would require the company to hire and train new workers "at considerable expense." J.A. 409, 423. It also alleged that Hinton and the company had various motives to inflate PowerSecure's stock price, and that these motivations, combined with Hinton's knowledge that he was misspeaking, satisfy the scienter requirement. J.A. 426–28.

Like the district court, we find the allegations of scienter inadequate. First, we must reject Appellant's theory that an inference that Hinton knew his statement was false is sufficient to show that Hinton acted intentionally or recklessly to deceive, manipulate,

10

or defraud. Second, we conclude that upon a holistic evaluation of all the facts in the amended complaint, the inference of scienter is neither "cogent and compelling, [nor] strong in light of other explanations." *See Tellabs*, 551 U.S. at 324. Accordingly, we affirm.

A.

First, an inference that Hinton may have known his statement was false does not alone satisfy the scienter requirement. Maguire Financial argues that "[i]t strains credulity to suggest that a highly experienced senior executive in such a pivotal position did not know whether a crucially important contract with a crucially important customer had been renewed or not," and "it makes no sense that Hinton's misrepresentation that the FP&L contract was a 'renewal,' rather than a new contract, could have been just negligent. Given the nature of the information, Hinton either knew the truth or knew that he did not. In either case, he acted with the requisite scienter." Appellant's Br. at 27, 32. We disagree.

As the district court correctly concluded, Appellant's argument fuses an inference that Hinton knew enough to realize that his characterization was technically incorrect with an inference that he intended it to deceive. Yet scienter and knowledge with respect to misrepresentation are distinct components of the requisite analytical framework. To conflate the two, as Appellant would have us do, would read the scienter element out of the analysis in contravention of the PSLRA's exacting pleading standard.An inference that an executive had enough knowledge to be aware that he was making an inaccurate

11

statement might support an inference that he made a material misrepresentation but does not necessarily suggest an intent to mislead. A statement might be misleading if, at the time it is made, the speaker believes it to be false. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1319 (2015). The material misrepresentation inquiry focuses on the reasonable investor's view of a factual statement, while the scienter inquiry focuses on the defendant's mental state. *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 38–39 (2011); *Tellabs, Inc.*, 551 U.S. at 319, 324; *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999). A reasonable investor might well expect a seasoned executive like Hinton to know the difference between a contract renewal and expansion and intend to make the distinction, but an investor's view of a statement is not itself evidence of the speaker's state of mind.

A plaintiff may not stack inference upon inference to satisfy the PSLRA's pleading standard. A securities fraud plaintiff must "state with particularity *facts* giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). Appellant alleges facts that permit an inference that Hinton knew his statement was false, and then asks us to *infer from that inference* that Hinton acted with scienter. We decline to do so because stacking inference upon inference in this manner violates the statute's mandate that the strong inference of scienter be supported by facts, not other inferences.

The facts presented here highlight the reason for cabining misrepresentation and scienter within their respective domains. The PSLRA reflects Congress's determination that liability for securities fraud should not be predicated solely on an overly optimistic

12

view of a future which may, in fact, encounter harsh economic realities down the road. Maguire Financial must show that Hinton affirmatively sought to advance or calculatedly sought to obscure that reality. The inference that Hinton may have knowingly misspoke alone does not do so.

Having concluded that Appellant cannot rely on having sufficiently pled a material misrepresentation to satisfy the scienter requirement, we now turn to a consideration of whether the complaint as a whole adequately alleges scienter.

B.

We now analyze "whether the allegations in the complaint, viewed in their totality and in light of all the evidence in the record, allow us to draw a strong inference, at least as compelling as any opposing inference, that the . . . defendants either knowingly or recklessly defrauded investors." *See Pub. Empls.' Ret.*, 551 F.3d at 313. "[T]he scienter inquiry necessarily involves consideration of the facts and of the nature of the alleged omissions or misleading statements within the context of the statements that a defendant affirmatively made." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 611 (4th Cir. 2015). Reversal is appropriate if the facts alleged strongly support the inference that the company "intentionally or recklessly misled investors." *See id.* at 610. For the reasons that follow, we conclude that they do not.

We have found that facts support a strong inference of scienter when a plaintiff identified "numerous allegedly misleading statements and omissions by the defendants that were not caused by the use of imprecise language or the execution of a legitimate

13

business decision." *Id.* This is not such a case. Appellant asks us to find intent to deceive investors in an executive's use of a single *possibly ambiguous* word on a live analyst call that purportedly mischaracterized an agreement that had historically accounted for approximately 4.1% of the company's annual revenue. This we cannot do. First, the statement does not support an inference that Hinton intended to deceive investors into thinking that PowerSecure would continue to serve West Palm Beach or otherwise maintain its existing profitability. Second, the statement itself embraces the possibility that the new contract was not a renewal on identical terms. Finally, the insider stock sales Appellant identifies were neither unusual nor suspicious. Accordingly, the facts alleged do not make the inference of scienter "more than merely 'reasonable' or 'permissible,'" "cogent and compelling," or "strong in light of other explanations." *See Tellabs*, 551 U.S. at 324.

1.

Viewed in the context of all the relevant facts, Hinton's statement provides little evidence of scienter because it does not suggest that PowerSecure would continue to serve West Palm Beach. Hinton never specified that the West Palm Beach contract had been extended or that PowerSecure would continue to serve West Palm Beach. He provided no details about the new contract or the geography that it would cover. His characterization of the new agreement as a "contract renewal" informed investors that PowerSecure would continue its relationship with FP&L. If Hinton wanted to deceive investors, we would expect that he would discuss the new contract at length, in greater

14

detail, or multiple times, not that he would briefly and ambiguously characterize it as a "renewal and expansion" once.

The amended complaint's failure to identify a single fact that shows that Hinton knew on August 7, 2013, that the new contract would be less profitable is a serious deficiency. Hinton would have no reason to convince investors that the second contract would continue to serve West Palm Beach unless he believed that the market would react negatively to a contract in Ft. Myers. Maguire Financial demands that we infer that the company knew that a Ft. Myers contract would be more expensive because "it is impossible that Hinton did not know the contract . . . would require the Company to hire and train new workers . . . at considerable expense." J.A. 423. But this is far from intuitive, and the only fact in the amended complaint that addresses the company's cost projections undermines that inference. In the excerpt from Hinton's May 7, 2014, conference call quoted in the amended complaint, Hinton admits that "we probably underestimated the negativity [and] the complexity of basically starting from scratch in a new territory." J.A. 418.

That the Ft. Myers contract eventually did reduce PowerSecure's profitability is not evidence that the risk of diminished profitability was known beforehand. The amended complaint does not allege that PowerSecure had previously incurred additional costs from serving an existing customer in a new location and therefore had reason to know that the Ft. Myers contract would be particularly costly. Nor does it allege that this was common knowledge in the industry and therefore would have been obvious to the company. These "omissions and ambiguities count against inferring scienter, for

15

plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *See Tellabs*, 551 U.S. at 363 (quoting 15 U.S.C. § 78u-4(b)(2)). We are reluctant to infer that Hinton knew in advance that the contract would be less profitable given the fact that the FP&L contract historically accounted for only 4.1% of the company's annual revenue and without facts to suggest that anyone should have known of this risk.

Even if someone at PowerSecure believed that a contract for Ft. Myers would cause the company to incur additional costs, no fact alleged suggests that Hinton was this person. The amended complaint alleges that PowerSecure advertised that Hinton operated "the day-to-day business in direct contact with individual sales leaders" and was regularly given information about the company's performance. J.A. 424–25. It is conceivable that Hinton was involved in negotiating the minutiae of the second contract such that he would be aware of the costs associated with hiring and training low-level workers. But it is just as likely that in practice Hinton did not personally learn those specific details about the agreement, that he believed the cost of establishing a presence in Ft. Myers would not be substantial, or that he believed any cost increase would be offset by savings from winding down operations in West Palm Beach. Thus, we find no evidence in Hinton's statement to support the conclusion that he intended to mislead investors listening to the August 7, 2013, call into believing that PowerSecure would continue to serve West Palm Beach.

2.

Second, Hinton's statement provides little evidence of scienter because a contract renewal need not be on the same terms as the prior agreement and can include replacement of the old contract with a different one. *Renewal*, *Black's Law Dictionary* (10th ed. 2014). Indeed, Hinton's statement suggested that the "renewal" would not be on identical terms, and thus the statement does not demonstrate an intent to deceive.

Hinton's description of the contract as a "renewal and expansion," following the June 6, 2013, announcement of a "renewed and expanded" award, undermines the inference that he used the phrase "contract renewal" in the same sentence to mislead investors into believing that the new contract was merely an extension of the original or to hide the possibility of future cost increases from investors. An expanded contract must be on different terms than the original, and by its very nature carries a risk that costs may rise due to inefficiencies in fulfilling the expansion. Even without additional context, Hinton's statement disclosed the possibility that PowerSecure's renewed contract might include a change of location or other terms.

3.

Third, the stock sales described in the amended complaint do not meaningfully strengthen the inference of scienter. Insider trading can support an inference of scienter "if the timing and amount of a defendant's trading were 'unusual or suspicious.'" *Teachers' Ret.*, 477 F.3d at 184. Here, PowerSecure sold 2.3 million shares and Hinton sold 200,000 shares on August 16, 2013, and Hinton transferred a total of $2.5 million of his shares to his wife in December 2013 and February 2014. Appellant argues that these

17

transactions show that Hinton and the company had a motive to defraud investors. We disagree.

Maguire Financial contends that the PowerSecure share sales at an inflated price generated proceeds used to acquire other companies and to defray the costs of the new FP&L contract. Perhaps so. But a company's ongoing need for, and use of, revenue is scarcely sufficient, standing alone, to suggest impropriety. *See Ottmann*, 353 F.3d at 352 (generalized motive to pursue acquisitions insufficient to satisfy pleading requirement). Yet Maguire Financial points to neither anything more nor identifies any specific unusual need.

Nor does Hinton's stock sale make the inference of scienter "strong in light of other explanations." *See Tellabs*, 551 U.S. at 324. He did not sell his shares when their value was highest. And Hinton's transfer of shares to his wife occurred some months after the August 7, 2013, statement in connection with their impending divorce. These facts do not approach those that would support a strong inference of scienter.

IV.

For the foregoing reasons, we conclude that Maguire Financial's amended complaint fails to adequately allege scienter. Accordingly, the judgment of the district court is

*AFFIRMED*.

18