**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 21-2351**

───────────

JAMES BOYKIN, lead plaintiff per order dated on 2/17/2021; ADNAN SAEED; CHAN-HEE KOH

       Plaintiffs - Appellants

v.

K12, INC.; NATHANIEL A. DAVIS; TIMOTHY MEDINA

       Defendants - Appellees.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, Senior District Judge.  (1:20−cv−01419−LO−TCB)

───────────

Argued:  October 27, 2022                    Decided:  November 22, 2022

───────────

Before WILKINSON and HEYTENS, Circuit Judges, and MOTZ, Senior Circuit Judge.

───────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Heytens and Senior Judge Motz joined.

───────────

**ARGUED:** Jeremy Alan Lieberman, POMERANTZ LLP, New York, New York, for Appellants.  Peter A. Wald, LATHAM & WATKINS LLP, San Francisco, California, for Appellees.  **ON BRIEF:** Brenda Szydlo, Brian Calandra, POMERANTZ LLP, New York, New York; Matthew B. Kaplan, THE KAPLAN LAW FIRM, Arlington, Virginia; Lesley F. Portnoy, PORTNOY LAW FIRM, Los Angeles, California; Andrea Farah, Christian Levis, White Plains, New York; Laurence Hasson, BERNSTEIN LIEBHARD LLP, New York, New York; Peretz Bronstein, BRONSTEIN, GEWIRTZ & GROSSMAN, LLC,

New York, New York, for Appellants.  Nicholas Rosellini, San Francisco, California, Stephen P. Barry, David L. Johnson, Washington, D.C., Peter Trombly, LATHAM & WATKINS LLP, New York, New York, for Appellees.

―――――――

WILKINSON, Circuit Judge:

This securities fraud lawsuit arises from a series of statements made by K12, Inc., and two of its executives over the spring and summer of 2020. Plaintiffs, a class of K12 shareholders who acquired stock during that time, allege that the statements fraudulently misrepresented the state of K12's business, thereby artificially inflating the cost of their shares. To survive dismissal under the Private Securities Litigation Reform Act (PSLRA), however, they must plead a "strong inference" of scienter, 15 U.S.C. § 78u–4(b)(2), which requires establishing an inference of fraud to be "cogent and at least as compelling as any opposing inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Because plaintiffs do not satisfy this "heightened pleading instruction[]," *id.* at 321, we affirm the district court's dismissal of their claims.

I.

K12, Inc., which has since rebranded as "Stride, Inc.," is a Virginia-based company that furnishes schools with curricula, administrative support, virtual-learning software, and other educational services. During the fiscal year ending in June 2020, K12 grossed more than $1 billion in revenue from schools enrolling some 134,000 students nationwide. Throughout the period relevant to this case, K12 was led by CEO Nathaniel A. Davis and CFO Timothy Medina, whom plaintiffs name, along with the company itself, as defendants.

In all, plaintiffs point to twenty-three statements made by defendants as part of an allegedly fraudulent effort to boost K12's flagging share price. The first eleven occurred around the company's quarterly earnings release on April 27, 2020. In a statement that day,

3

Davis touted physical school closures—in response to the COVID-19 pandemic—as a major business opportunity for K12. The company's "core competency" in online learning, Davis explained, "positions us well given how the education market is likely to change." J.A. 34. During the ensuing earnings call, Davis elaborated that school districts' shift to remote learning had led K12's phones "to ring off the hook" and prompted a "sharp increase in [website] traffic." J.A. 34. "I think this is a positive tailwind," Davis reiterated. J.A. 70. Meanwhile, he assured that K12's "academic experience" had remained "essentially school as usual." J.A. 34.

K12's share price subsequently underwent a months-long climb in tandem with the broader stock market. From a closing price of $25.04 on April 27, K12 shares ascended to an all-time high of $52.84 on August 5. News concerning a potential new partnership may have contributed. At a special July 29 board meeting of Miami-Dade County Public Schools (Miami-Dade), the nation's fourth-largest school district, a district official announced plans "to purchase [K12's] platform, along with its content," using COVID-19 relief funds. J.A. 354.

At the time of K12's next quarterly earnings release on August 11, the company's shares had closed at a price of $47.07. Plaintiffs contend that defendants made another twelve misleading statements over the following days. They point, for instance, to Davis suggesting that K12 customers "did not experience disruption," and that K12 "stand[s] ready to support schools and school districts of any size during this critical time." J.A. 37. They also evidence a statement by the company in its 10-K filing that "distinctive core competencies . . . allow us to meet the varied needs of our school customers and students."

4

J.A. 38. Plaintiffs further reference the company's statement that it "protect[s] sensitive information" and "maintain[s] a layered security architecture" to combat cybersecurity threats becoming "more sophisticated and pervasive." J.A. 39, 75.

Most of all, plaintiffs stress comments made by Davis alluding to a reported deal with Miami-Dade. Confirming the partnership, Davis said: "K12 will provide customized services, including curriculum, assessment tools, teacher training and data management." He later added that K12 was "working with other school districts on their own customized solutions for the fall as well." J.A. 79. At one point, Davis remarked:

> We are seeing increase . . . in school districts who call us and want to use our content and our curriculum with more of those contracts this year than we've ever had in any one year before. *I mentioned Miami-Dade, there's others we're working on, not yet disclosed, but maybe not as large as Miami-Dade.*

J.A. 81 (emphasis added). Eight days later, in a Yahoo! video interview, Davis said that Miami-Dade was "using online tools to reach their students." J.A. 89. Two financial analysts covering K12 applauded the company, respectively, for having a "contract signed" and a "contract win." J.A. 21–22.

In late August, news broke that the K12-Miami-Dade relationship was faltering. First, a story in the *Miami Herald* on August 25 quoted a district official as saying K12's platform "fell below the expectations we set." J.A. 40. Then, on August 26, the leader of the Miami-Dade teachers' union told CBS Miami that K12's training had been "ineffective." J.A. 41. An article in the *Miami Herald* on September 2 reported that the K12 platform had suffered twelve cyberattacks. The article also revealed that Miami-Dade had yet to sign its contract with K12. (Miami-Dade's superintendent had in fact signed—

5

but not returned—the contract on August 17.) Ultimately, on September 10, Miami-Dade's board voted to terminate the partnership. That day, K12 shares closed at a price of $30.55, capping off a 35% one-month decline. On September 17, the stock fell further on news that another school district, Beaufort County, South Carolina, was also ending its partnership with K12. The price of K12 stock closed at $28.30 that day and eventually reached a low of $20.39 on December 29.

As K12 shares declined in value during the fall of 2020, multiple shareholders brought suits under Sections 10(b) and 20(a) of the Securities Exchange Act (Exchange Act), and Rule 10b-5 promulgated thereunder. After the Eastern District of Virginia consolidated their claims, plaintiffs filed an amended complaint against K12, Davis, and Medina in April 2021. Plaintiffs now represent a class of persons and entities, apart from defendants, who acquired K12 shares between April 27 and September 18, 2020. The district court, finding that plaintiffs had inadequately pled falsity and scienter, granted defendants' motion to dismiss in September 2021. After plaintiffs declined the opportunity to replead, the district court entered judgment dismissing their complaint with prejudice. The present appeal followed.

## II.

Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act turn on their contention that defendants violated Rule 10b-5. Our handling of claims like theirs changed upon the enactment of the Private Securities Litigation Reform Act of 1995 (PSLRA). In this Act, Congress sought to distinguish meritorious suits from dismissible actions. The law required plaintiffs to "specify each statement" by defendants "alleged to have been

6

misleading" and to supply "the reason or reasons why." 15 U.S.C. § 78u–4(b)(1)(B). The PLSRA also required plaintiffs to "state with particularity facts giving rise to a strong inference" of defendants' culpable "state of mind." *Id.* § 78u–4(b)(2). Certain forward-looking statements made by defendants are, moreover, entitled to a "safe harbor" from liability under the Act. *Id.* § 78u–5(c).

The Supreme Court has emphasized that the PSLRA responded to concerns that meritless securities lawsuits had "resulted in extortionate settlements, chilled any discussion of issuers' future prospects, and deterred qualified individuals from serving on boards of directors." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006). The heightened pleading requirements, mentioned above, addressed the problem of suits being routinely filed "whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability." H.R. Conf. Rep. No. 104–369, at 31 (1995). Congress in no way overlooked the role that misrepresentations can play in manipulating the price of securities. The mere incidence of a declining stock price, however, should not elicit "lawyer-driven litigation." *Tellabs*, 551 U.S. at 322. Through "substantive and procedural controls," Congress thus sought to "screen out" suits of this nature, "while allowing meritorious actions to move forward." *Id.* at 320, 324.

Under Rule 10b-5, plaintiffs must in part establish "(1) a material misrepresentation or omission by the defendant[s]" and "(2) scienter." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018). Here, plaintiffs relied on defendants' twenty-three statements to make out their claim. Yet, as discussed below, the majority of these statements have repeatedly been held to belong to non-actionable designations. The remaining statements, which chiefly

7

concern K12's relationship with Miami-Dade, fail to survive the above pleading standards set forth in the PSLRA and the Supreme Court's *Tellabs* decision.

A.

Our discussion begins with the bulk of defendants' statements that are not "actionable" under the securities laws. *See, e.g.*, *In re Marriott Int'l, Inc.*, 31 F.4th 898, 901 (4th Cir. 2022) ("Not all material omissions are actionable."). While plaintiffs draw upon twenty-three statements in their complaint, quantity is not the same as quality. A substantial number of defendants' statements fall into one or more of the following non-actionable categories.[1]

First, there is the category of puffery. This genre of "immaterial boasting and exaggerations" will generally not constitute fraud. *Xia Bi v. McAuliffe*, 927 F.3d 177, 183 (4th Cir. 2019); *see also Miller v. Premier Corp.*, 608 F.2d 973, 981 (4th Cir. 1979). An enterprise in the process of raising capital will naturally seek to present itself in a positive light. But the law recognizes that not all self-promotion is actionable, nor does Rule 10b-5 exist to "purge the market of all optimism." *Xia Bi*, 927 F.3d at 183. The relevant standard is whether "a reasonable investor, exercising due care, would gather a false impression

---

[1] Plaintiffs additionally argue that K12 violated Rule 10b-5 by inadequately disclosing cybersecurity vulnerabilities. To the contrary, K12 acknowledged at length in each 10-K filing its susceptibility to them. J.A. 74–75, 87.

The risk of cyberattacks is one that is common to many businesses and not something of which a reasonable investor would have been unaware. That defendants added strong cautionary language in their 10-K filings further undermines plaintiffs' claim.

from a statement, which would influence an investment decision." *In re Marriott*, 31 F.4th at 902 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999)).

Plaintiffs fault K12 for claiming its "academic experience" had remained "essentially school as usual." J.A. 68. They take further exception to K12 touting its technological "core competency," "expertise," and "flexibility." Appellants Reply Br. 2 (quoting J.A. 67, 69, 79). K12's words exemplify, however, the kind of general positivity that "reasonable investors could not have relied upon when deciding whether to buy stock." *Longman v. Food Lion, Inc.*, 197 F.3d 675, 685 (4th Cir. 1999). As we have noted, it is not actionable for a company to give positive descriptions of what it reasonably believes to be its strengths. As this court has held, a company may state that its offerings are "well suited to the demands of [its] customers" without committing securities fraud. *Id.* K12's statements would thus not warrant liability unless they "invent[ed] advantages and falsely assert[ed] their existence." *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) (quoting *United States v. New S. Farm & Home Co.*, 241 U.S. 64, 71 (1916)). K12's descriptions here did neither. The company offered no quantitative metrics, qualitative comparisons, or other specifics to bolster its claims of "competency" and "flexibility." Rather, those boasts reflected the natural role that puffery can play in contract formation. A dose of generic enthusiasm can, indeed, "ultimately serve to encourage the free flow of capital in the marketplace." *Xia Bi*, 927 F.3d at 183.

A second set of defendants' statements constitute non-actionable "opinions." These "inherently subjective and uncertain assessments" may often be recognized by their wording. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S.

175, 186 (2015). Whereas the line between opinion and fact is not invariably clear, opinion is subject to reasonable disputation in a way that a false statement of fact is not. The prefatory "I believe" or "I think," for example, conveys that a speaker is sharing a personal belief, not warranting facts. The "reasonable investor is expected to understand" such a statement "in its full context." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 322 (4th Cir. 2019). Liability only attaches if the opinion contains "embedded" false facts or omits material facts "that cannot be squared." *Omnicare*, 575 U.S. at 184–85, 191.

Several of defendants' statements amount to opinions. Opinions, of course, often contain puffery as well. Consider, for example, K12's statement: "As an innovator in K-12 online education, *we believe* we have attained distinctive core competencies that allow us to meet the varied needs of our school customers and students." J.A. 82 (emphasis added). By including the language of "we believe," the statement reflected not an incontestable fact but an individual perspective. The statement was couched as opinion, not as fact. While it is true that the prefatory clause contains an embedded assertion—that K12 is "an innovator in K-12 online education"— plaintiffs do not seriously contest this point. Nor do plaintiffs deny, in more than conclusory fashion, that K12 "actually holds" its stated belief. *Omnicare*, 575 U.S. at 184. Finally, plaintiffs fail to show that K12's opinion omitted necessary context. The company's opinion was not simply emitted into the ether. It was made within the framework of a 10-K filing, where investors could have parsed the ample disclosures at their fingertips before succumbing to K12's stated view.

10

A remaining handful of defendants' statements are non-actionable under the PSLRA's "safe harbor" for forward-looking statements. 15 U.S.C. § 78u–5(c); *see, e.g.*, *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1066 (2018). Such statements, when made with "meaningful cautionary" language and without "actual knowledge" of falsity, will not support a Rule 10b-5 violation. 15 U.S.C. § 78u–5(c)(1); *see, e.g.*, *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 750 n.4 (4th Cir. 2021). Davis's statement that a shift toward online instruction "positions us well," J.A. 67, for instance, falls within the safe harbor as a projection of "future economic performance." 15 U.S.C. § 78u–5(i)(1). While the safe harbor does not cover assertions of *present* fact, Davis's statement was no such thing. Although he employed the present tense, it is apparent from Davis's statement—read as a whole—that he was referring to K12's future prospects "given how the education market is likely to change." J.A. 67. The present tense does not always evince a present fact. *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (holding the phrase, "are on track," to be forward-looking).

Projections, like opinions, are fallible. "[A]s Yogi Berra observed, 'It's tough to make predictions, especially about the future.'" *Xia Bi*, 927 F.3d at 183. For this very reason, imposing liability on them would "deter companies from discussing their prospects," thereafter leaving "the securities markets . . . deprived of the information those predictions offer." *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993). By allowing Davis to project how a trend toward "distance and digital learning" would impact K12's business, J.A. 67, the PSLRA safe harbor enabled investors "to make better-informed judgments." *Xia Bi*, 927 F.3d at 183.

11

B.

Of defendants' statements that are neither puffery, opinion, nor prognosis, those discussing K12's relationship with Miami-Dade furnish plaintiffs' primary complaint. While the proposed partnership—at $15.35 million—would have made up less than two percent of K12's annual revenues, plaintiffs highlight the district's 270,000-student enrollment. (By comparison, K12 served roughly 134,000 students at the time.) Drawing all reasonable inferences in plaintiffs' favor, the prospect of the Miami-Dade deal could well have factored into the run-up of K12 shares during the summer of 2020.

But materiality is just one component of a Rule 10b-5 claim. To avoid dismissal, plaintiffs must also plead, *inter alia*, "falsity with specificity" and "allege facts giving rise to a strong inference of scienter." *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008). It is altogether possible that a deal falling apart could reflect "market risks," not "securities fraud." *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 168 (4th Cir. 2007). Here, plaintiffs point to comments from a single defendant, Davis, touting K12's relationship with Miami-Dade on two occasions: first, during the August 11 earnings call; and second, as part of a Yahoo! interview on August 19. Plaintiffs especially emphasize an extract from the earnings call in which Davis said:

> We are seeing increase . . . in school districts who call us and want to use our content and our curriculum with more of those contracts this year than we've ever had in any one year before. *I mentioned Miami-Dade, there's others we're working on, not yet disclosed, but maybe not as large as Miami-Dade.*

J.A. 81 (emphasis added). Plaintiffs contend that Davis misled investors into believing that K12 had a fully executed contract with Miami-Dade when it did not. Two financial analysts

12

covering the company, plaintiffs note, assumed from such statements that the contract had been won. J.A. 21–22.

The falsity element of a Rule 10b-5 claim boils down to "the reasonable investor's view" of Davis's statements, however, not *any* individual investor's reaction. *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017). While Davis's statement was imprecise, plaintiffs nowhere allege that Davis, for all his enthusiasm about the Miami-Dade partnership, ever attested unambiguously to having a signed agreement. Far from whistling in the wind, Davis was gesturing to an extensive working relationship between K12 and Miami-Dade. The parties had begun negotiating the terms of their partnership in early July 2020, with K12 taking steps then "to set up the platform, integrate its systems, train personnel, and roll out the temporary [software] in time for the first day of school." J.A. 484. By July 10, the parties had agreed to a price. A district official then announced on July 29 that the district "intend[ed] to purchase" K12's platform, even specifying the source of funding to be tapped. J.A. 354. Miami-Dade subsequently informed the Florida Department of Education on July 31 that it would be partnering with K12. J.A. 383, 390. By August 10, a full-scale contract was reduced to writing. J.A. 489. On August 17, following K12's earnings call and just two days before Davis's appearance on Yahoo!, Miami-Dade's superintendent even *signed* (but did not return) the completed contract. J.A. 394, 492. In short, after a long and extended series of negotiations, a contract with Miami-Dade was well on its way when Davis made his statements.

Though no celebratory ribbon was tied up in the end, plaintiffs may not "plead[] fraud by hindsight." *Triangle*, 988 F.3d at 753 (internal quotation marks omitted). It was

13

not until August 25 that reports began to emerge of Miami-Dade's dissatisfaction with K12. Even then, the mere presence of friction does not portend the end of a business partnership. Even the most fruitful relationships can encounter bumps along the road. It was only on September 10, more than three weeks after Davis's last statement, that Miami-Dade called off its deal with K12.

The extensive business relationship between K12 and Miami-Dade bears not only upon any alleged falsity of Davis's statements, but upon the element of scienter. Whereas "[t]he material misrepresentation inquiry focuses on the reasonable investor's view of a factual statement, . . . the scienter inquiry focuses on the defendant's mental state." *Maguire*, 876 F.3d at 548. To show a culpable state of mind, plaintiffs must allege with particularity facts inferring defendants' "intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (internal quotation marks omitted). Under the PSLRA's heightened standard, such an inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

The first strike against plaintiffs' scienter claims is their inability, recounted above, to point to a statement of clear falsity. Although falsity and scienter are distinct elements of a Rule 10b-5 claim, they are, as noted, interrelated. Just as "certain statements are such that, to show them false is normally to show scienter as well," *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010), the inverse is also true. In this regard, Davis's statements were not spun from whole cloth. The timeline is consistent with his anticipation in mid-August of a consummated deal with Miami-Dade. Even assuming that Davis knew of frictions with

14

the district before the first news report revealed them on August 25, he may still have figured that they would be smoothed over. That was apparently, in any event, the attitude of Miami-Dade's superintendent, who did not refrain from signing K12's contract on August 17. If the relationship had been irreparably broken by then, his signature is perplexing. Moreover, if Davis aimed to inflate K12's share price at all costs, he could have chosen far less ambiguous language than he did. Plaintiffs have not put forth facts tending to make a fraudulent inference "at least as compelling" as one of innocence. *Tellabs*, 551 U.S. at 314.

The plaintiffs face additional hurdles. While defendants could have unloaded K12 shares at prices that plaintiffs contend were fraudulently elevated, plaintiffs do not allege in their complaint "suspicious" insider selling or other kinds of self-dealing. *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005). Nor do they suggest that Davis and Medina would personally benefit from a special bonus or an impending performance review. All plaintiffs can muster is that defendants wished to "boost" the price of K12 shares because the stock had declined the previous year. Appellants Br. 3. Yet the unvarnished wish to increase K12's share price is precisely the kind of "generalized motive[] . . . shared by *all* companies" that is "insufficient to plead scienter under the PSLRA." *Triangle*, 988 F.3d at 754 (quoting *Ottmann v. Hanger Orthopedic Grp.*, 353 F.3d 338, 352 (4th Cir. 2003)). In any case, plaintiffs do not connect the dots for why a lagging stock price would have motivated defendants to commit securities fraud. Their theory that defendants would undermine their long-term credibility—and risk considerable bad press—just to pump up K12's share price for a few months is unpersuasive. That

15

defendants would tout a contract doomed to fail is "not even plausible, much less convincing." *Cozzarelli*, 549 F.3d 618, 627 (4th Cir. 2008).[2]

Plaintiffs insist, however, that defendants were reckless. The kind of "severe recklessness" that suffices for scienter refers to "highly unreasonable" conduct marking "such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff." *Triangle*, 988 F.3d at 751 (internal quotation marks omitted). Plaintiffs' argument—largely reliant on the accounts of confidential witnesses—that it was "highly unreasonable" for defendants to be optimistic about the Miami-Dade contract is not supported by the record. Far from peddling "a pebble of sand," Appellants Br. 2, K12 had a long track record of furnishing educational services to school districts. Whereas more than 500 school districts use its software platform, plaintiffs could name only *two* that stopped.[3]

Evaluating allegations of scienter under the PSLRA is "necessarily a comparative inquiry." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014). Here the

---

[2] The parties disagree about Davis's statement that K12 was "ready to support schools and school districts of any size" like Miami-Dade. J.A. 79. The defendants contend this statement was puffery. We think the stronger point, however, is that plaintiffs' allegations do not create a strong inference of scienter. Instead, "the much stronger inference is that Defendants had an honest debate about the merits of a subjective business judgment"—whether K12 was ready to support large school districts like Miami-Dade in the fall of 2020—"and in hindsight, simply made the wrong choice." *Triangle*, 988 F.3d at 754.

[3] In the year following the class period, the price of K12 shares rose by 31.1%. Two years following the class period, it had increased by 47.4%. By comparison, the S&P 500, a leading index of large public companies, increased by 33.5% and 16.7%, respectively, during the same two periods.

16

most plaintiffs can demonstrate is that Davis, on one occasion, tacked together two sentences in a somewhat loose way. Faced with a more cogent inference that defendants believed they could profit from pandemic-related disruptions and secure the Miami-Dade deal, the district court correctly found that plaintiffs did not state a viable claim for relief.

Its judgment is therefore

*AFFIRMED.*