**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 21-2309**

—————————

SAN ANTONIO FIRE & POLICE PENSION FUND; EL PASO FIREMEN & POLICEMEN'S PENSION FUND, individually and on behalf of all others similarly situated,

    Plaintiffs - Appellants,

and

EGLE VAITKUVIENE,

    Plaintiff,

v.

SYNEOS HEALTH INC.; ALISTAIR MACDONALD; GREGORY S. RUSH; MICHAEL A. BELL; ROBERT BRECKON; DAVID F. BURGSTAHLER; LINDA S. HARTY; RICHARD N. KENDER; WILLIAM E. KLITGAARD; KENNETH F. MEYERS; MATTHEW E. MONAGHAN; DAVID Y. NORTON; ERIC P. PAQUES,

    Defendants - Appellees.

—————————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:18-cv-00029-FL)

—————————

Argued: December 8, 2022        Decided: July 24, 2023

—————————

Before HARRIS and RICHARDSON, Circuit Judges, and Patricia Tolliver GILES, United States District Judge for the Eastern District of Virginia, sitting by designation.

—————————

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Harris and Judge Giles joined.

_____

**ARGUED:**  Douglas Wilens, ROBBINS GELLER RUDMAND & DOWD LLP, Boca Raton, Florida, for Appellants.  Brian Thomas Frawley, SULLIVAN & CROMWELL LLP, New York, New York, for Appellees.  **ON BRIEF:**  Jack Reise, Stephen R. Astley, Elizabeth A. Shonson, ROBBINS GELLER RUDMAN & DOWD LLP, Boca Raton, Florida, for Appellants.  David H. Kistenbroker, Joni S. Jacobsen, DECHERT LLP, Chicago, Illinois, for Appellee Gregory S. Rush.  Y. Carson Zhou, Krystal D. Valentin, SULLIVAN & CROMWELL LLP, New York, New York, for Appellees Syneos Health, Inc.; Michael A. Bell; Robert Breckon; David F. Burgstahler; Linda S. Harty; Richard N. Kender; Williams E. Klitgaard; Alistair Macdonald; Kenneth F. Meyers; Matthew E. Monaghan; David Y. Norton; and Eric P. Pâques.  Lee M. Whitman, WYRICK ROBBINS YATES & PONTON LLP, Raleigh, North Carolina, for Appellees.

_____

2

RICHARDSON, Circuit Judge:

A company's investors voted for a merger, but now feel that they were misled in violation of federal securities law. Before the vote, the company and its executives gave the investors high hopes by espousing optimistic projections for the merged entity. A few months later—with the merger cemented—the investors' hopes were dashed as the company's economic outlook darkened. Yet not every financial disappointment is actionable under federal law. Here, as is often the case, the optimistic projections proved wrong but no one is liable. So the district court was right to dismiss Plaintiffs' class-action lawsuit.

## I.      Background

This case arose when two companies merged in the biopharmaceutical market. Biopharmaceutical companies develop medicines from living cells. Those medicines must be tested and then approved by the Food and Drug Administration before they can be publicly marketed. The two companies here—INC Research Holdings, Inc. and inVentiv Health, Inc.—did not develop their own medicines, but helped other companies that did. Pre-merger, INC Research specialized in assisting biopharmaceutical companies conduct clinical trials as part of the Food and Drug Administration's approval process. And inVentiv mostly provided commercialization services for approved drugs. In other words, INC Research helped pharmaceutical companies get their drugs approved, while inVentiv

3

helped companies sell their drugs after approval. Wanting to break into the approved-drug-commercialization market, INC Research sought to merge with inVentiv in 2017.[1]

The two companies started laying the groundwork well in advance, first discussing the merger in November 2016. For the next few months, INC Research's executives conducted due diligence on the potential deal. Their due diligence included looking at inVentiv's commercial business and its relationships with key customers. The last due diligence meeting was on May 2, 2017. About a week later, the companies issued a press release announcing their intent to merge.

Finalizing the merger required approval by INC Research's shareholders. Because inVentiv was a privately owned company, there was limited public information about its business health. But, aside from the May press release, the shareholders still had at least two other means to learn about inVentiv before voting: earnings calls and proxy materials. During the earnings calls, shareholders could ask questions about the merger directly to INC Research's executives. The proxy materials—which INC Research filed with the Securities and Exchange Commission and distributed to shareholders before the merger vote—also contained details about the merger.[2]

---

[1] After the merger, in January 2018, INC Research changed its name to Syneos Health, Inc. As the relevant events here occurred before the name change, we refer to the company as INC Research both before and after the merger.

[2] Proxy materials are documents provided to investors that help them make informed decisions about their votes. *See* J.A. 134; *see also* 17 C.F.R. § 240.14a-3.

Some of these communications, Plaintiffs say, were misleading. Specifically, Plaintiffs claim that they relied on allegedly misleading statements that INC Research and its executives made in three different communications: (1) the press release announcing the merger; (2) an earnings call held on May 10; and (3) an earnings call held on July 27.

First came Defendants'[3] press release announcing the proposed merger. It "projected" that INC Research's adjusted earnings per share would increase in the first year following the merger, with mid- to high-single-digit growth in 2018 and over 20% growth in 2019.[4]

Later that same day, May 10, Defendants held an earnings call during which they discussed the benefits of the potential merger. On the call, Defendants disclosed that inVentiv's commercial business was down in 2017 because of customer cancellations and low drug-approval rates from the Food and Drug Administration. But INC Research's CEO noted that new drug approvals were rebounding and that these approvals "feed[ ]" the commercial business. J.A. 60. Similarly, INC Research's CFO called the potential new-drug approvals "a huge leading indicator" of future commercial business. J.A. 61. He said that the team was "confident" in high revenue growth in 2018 based on "new drug

---

[3] Plaintiffs bring four separate claims, some against one group of defendants, and others against a different group. These two groups involve distinct combinations of INC Research and its executives. But nothing in our opinion rests on the distinction between the two groups, so we refer to both classes of defendants as "Defendants" collectively.

[4] The fiscal year that Defendants used for their projections and business data essentially tracked the calendar year, beginning January 1 and ending December 31.

5

applications doubling" in 2017 and "the pipeline discussions we're having with our customers." J.A. 61.

Then, over two months later, on July 27, there was another earnings call. INC Research's CFO told investors: "We're more optimistic today than we were on May 10" about the combined company's growth numbers for 2018. J.A. 66. He linked his optimism, in part, to strong new-drug-approval numbers, calling them "a precursor to" and "leading indicator" of success in the commercial business. J.A. 43. But he also told investors that the commercial business still had to "close" business "in the second half of this year" to hit its projections. J.A. 43.

INC Research shareholders voted to approve the merger and it finalized in August 2017. Before the vote, INC Research provided the shareholders with proxy materials that recommended approval and included the merger announcement press release and the May 10 earnings call transcript. Those documents also contained detailed cautionary language, warning investors that this was a risky undertaking and success was not guaranteed.

These warnings proved prescient. Things soured quickly and the rest of the year was painful for the shareholders. Starting in September, the company's stock price plummeted. The fall followed comments from INC Research's CFO that inVentiv's commercial business was a "wild card" that would experience "roughly flat" revenue growth in 2018 and lead to only single-digit revenue growth for the overall company post-merger. J.A. 45–46. Defendants said that this was partially because—although drug

6

approvals were up—inVentiv had secured no large sales contracts in 2017.[5]   INC Research's year rounded out with a series of corporate departures and reshuffling that lasted through early 2018.

On the heels of this turmoil, an INC Research shareholder brought a class action against INC Research and its CEO and CFO, purporting to represent those who bought INC Research stock between May 10 and November 8, 2017.   The district court then appointed two pension funds as lead plaintiffs:  San Antonio Fire & Police and El Paso Firemen & Policemen.  They filed an amended complaint asserting four claims under the Securities Exchange Act of 1934:  (1) violations of § 10(b) and Rule 10b-5; (2) violations of § 14(a) and Rule 14a-9; and (3) and (4) control person liability under § 20(a), based on the alleged §§ 10(b) and 14(a) violations, respectively.[6]   They also added several other INC Research executives as defendants.

Plaintiffs' core allegation is that Defendants misled them into thinking that the merger would be more successful than it was by painting a rosy picture of the future without also disclosing critical, adverse facts.  Specifically, they allege that Defendants never told

---

[5] Both parties refer to these large sales contracts as "100-plus sales team contracts." J.A. 77.  The term describes commercialization contracts for approved drugs that require at least 100 sales representatives.   But Defendants dispute that this moniker describes a particularly unique subset of large contracts.  Because it does not matter for our analysis, we decline to weigh in on that dispute.  And, throughout this opinion, when we say "large sales contracts" we mean "100-plus sales team contracts."

[6] As is standard, this opinion refers to the claims according to the Securities Exchange Act sections from which they arise.  However—in U.S. Code-speak—the claims are based on 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a) respectively.

shareholders—at least, not before they approved the merger—that inVentiv's commercial business depended on signing large sales contracts, nor that inVentiv had not yet secured any of these contracts in 2017. They claim that Defendants knew this information and so misled investors by giving more optimistic projections than were warranted.

The district court dismissed Plaintiffs' case for failure to state a claim. It first held that Plaintiffs' allegations could not satisfy § 10(b)'s scienter requirement. It then dismissed their § 14(a) claim, determining that Defendants had provided sufficient disclaimers to make any alleged misrepresentations immaterial. Lastly, it rejected Plaintiffs' § 20(a) claims because—with the alleged § 10(b) and § 14(a) violations dismissed—there were no viable predicate offenses. On appeal, Plaintiffs challenge the dismissal of each claim. Reviewing the order de novo, we affirm.

## II.      Discussion

### A.      Section 10(b) claim:  Plaintiffs have not adequately pleaded scienter

Section 10(b) of the Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of [Securities and Exchange Commission] rules." 15 U.S.C. § 78j(b). Those rules render it unlawful to "make," "in connection with the purchase or sale of any security," "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5.

Private parties suing under these provisions must establish six elements, one of which is "scienter." *See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148,

8

157 (2008).[7] That element requires Plaintiffs to establish that Defendants intentionally or recklessly misled them. *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 344 (4th Cir. 2003). The district court found that Plaintiffs failed to adequately allege scienter and so dismissed the claim. We agree.

At the motion-to-dismiss stage, § 10(b) plaintiffs face "heightened pleading requirements." *Stoneridge*, 552 U.S. at 165; *see also* 15 U.S.C. § 78u–4(b). When it comes to scienter, this means that plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted" with intentional or reckless deception "with respect to each act or omission alleged." *See* 15 U.S.C. § 78u–4(b)(2)(A); *Ottmann*, 353 F.3d at 344. So, to win on appeal, Plaintiffs must raise a strong inference that Defendants intended to deceive them or created such a high risk of misleading them that Defendants must have known that they were being deceptive. *See Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).[8]

Applying this heightened pleading standard is a comparative, two-step process. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). We first consider the

---

[7] In total, the six elements that a plaintiff must prove in a § 10(b) case are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge*, 552 U.S. at 157.

[8] *See also Ottmann*, 353 F.3d at 343 (defining a reckless act as one "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it").

9

"inferences [of scienter] urged by the plaintiff." *Id.* We then weigh those inferences against "competing inferences rationally drawn from the facts alleged," *id.*, giving each only "the inferential weight warranted by context and common sense." *Matrix Capital*, 576 F.3d at 183. In the end, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

In this case, to understand the inference of scienter that Plaintiffs urge—*i.e.*, Plaintiffs' inference about *why* Defendants made the contested statements (or omissions)— we must first identify *how* Defendants' statements might mislead. Plaintiffs rely on three statements, two from May and one from July. Each is purportedly misleading in the same way: It made sunny predictions about future performance without also telling investors that inVentiv had secured no large sales contracts, and without warning investors that this failure was a major indicator of future headwinds.[9] Absent this extra information, Plaintiffs say, Defendants' projections were misleading.

_____

[9] Plaintiffs do not allege that the statements were misleading simply because they contained optimistic growth projections that turned out to be false. That is for good reason, since forward-looking statements and puffery are often non-actionable under the Securities Exchange Act. *See Boykin v. K12, Inc.*, 54 F.4th 175, 183–84 (4th Cir. 2022). Plaintiffs instead focus their ire on what they characterize as omissions of present or historical fact, which generally *are* actionable. *See id.*

We need not resolve whether that characterization holds water. This opinion's § 10(b) analysis focuses only on the scienter element, and does not address whether Plaintiffs' claim might fail for other reasons too. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021) (explaining that § 10(b)'s elements "can be addressed in any order" and that "the failure to adequately allege scienter is enough to doom the claim").

So that is *how* the contested statements might mislead.  But, to prevail, Plaintiffs must also address *why* Defendants made those statements.  Specifically, Plaintiffs must create a strong inference that Defendants intended to mislead investors—or else recklessly disregarded the risk that they might do so—when they gave their projections without the extra information.  Establishing this "*why*" requires first showing that Defendants knew the missing information.  It also requires showing that Defendants knew that the information was relevant for evaluating their projections.  And it requires showing that Defendants went ahead and left the information out anyway, with the intent to mislead Plaintiffs—or at least with a reckless disregard for the risk that leaving the information out would make their projections misleading.

In sum, Plaintiffs' § 10(b) scienter allegation boils down to whether they can raise a strong inference that Defendants:  (1) knew when they spoke in May and July that inVentiv had not secured any large sales contracts; (2) knew that failing to secure those types of contracts was a predictor of future poor performance; and (3) knew at that time, or were at least reckless to the risk, that investors would be materially misled if they were not told this information—*i.e.*, that failing to secure those contracts by that point in the year was such a *strong* negative predictor that Defendants' projections must be misleading without disclosing it.

At the outset, we note that Plaintiffs do not put forward any plausible motive for why Defendants sought to defraud investors.  True, they were not required to.  But we cannot ignore this omission.  It "weighs heavily" against them in the scienter analysis.  *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021) (cleaned up).  After

11

all, we generally do not presume that "defendants would tout a contract" that they knew was "doomed to fail" without some ulterior motive. *Boykin*, 54 F.4th at 186. To overcome this weakness, Plaintiffs' "circumstantial evidence of fraud must be correspondingly greater." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

But Plaintiffs' alleged circumstantial evidence falls far short. To create an inference of scienter, they point primarily to Defendants' due diligence leading up to the merger. According to Plaintiffs' allegations, Defendants held a series of meetings at which they generally discussed the commercial aspects of inVentiv's business. Because, Plaintiffs contend, Defendants talked about inVentiv's commercial business at these meetings, they therefore must have realized: (1) that inVentiv had not yet secured any large sales contracts; (2) that those contracts were, in general, a predictor of inVentiv's future performance; and (3) that failing to secure any of those contracts by that point in the year was such an important predictor that it would be misleading to forecast commercial success for the next year without telling investors about that extra information.

Plaintiffs thus ask us to infer specific knowledge from these due diligence meetings. But we can't. That general due diligence occurred does not support the inference that Defendants learned any specific information: neither that, by midyear, inVentiv had not yet signed any large sales contracts, nor that these contracts were important for inVentiv's business model.

Put differently, Plaintiffs essentially assert that Defendants *should have known* about certain business facts given their diligence. But that proposition, in effect, merely argues that Defendants *negligently* performed due diligence: "It would have been poor due

12

diligence if they did not learn these facts."  And mere negligence cannot support a § 10(b) claim; Plaintiffs must plead, at a minimum, recklessness.  *See Ottmann*, 353 F.3d at 343.

As we have said, we cannot impute factual knowledge to individuals merely based on their professional position or because "such knowledge relates to the business's core operations."  *KBC Asset Mgmt.*, 19 F.4th at 612.  That is, we may not infer—from the mere fact that Defendants learned *general* information about inVentiv's business—that they thus learned *specifically*:  (1) that inVentiv had not yet signed the particular types of contracts at issue here, nor (2) that those contracts were predictors of inVentiv's future business success.  *See In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 646 (2d Cir. 2015) (explaining that a mere allegation that proper due diligence would have uncovered certain information is "generally insufficient to establish the requisite scienter for private securities fraud claims"); *see also Tellabs*, 551 U.S. at 326 (explaining that "omissions and ambiguities count against inferring scienter").

But there's more.  Even were we to set all that aside—and momentarily infer that Defendants learned through their due diligence meetings both (1) that inVentiv had not yet secured a large sales contract, and (2) that these contracts were important for inVentiv's business model—Plaintiffs would still be out of luck.  Simply knowing this information would not be enough for scienter.  Defendants would also have to know—or, at a bare minimum, be reckless to a risk—that declining to share that information would render their rosy predictions *misleading* for investors.  *See Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017).

13

Yet we "may not stack inference upon inference to satisfy the [§ 10(b)] pleading standard." *Id.* And the inference that Defendants learned this information about inVentiv's business does not necessarily support the further inference that Defendants knew (or were reckless to the risk that) their future predictions would be *misleading* without including that information. After all, Defendants might well have believed that their earnings projections were unaffected by inVentiv's failure to secure a large contract by the time of their due diligence meetings.

Recall that the last due diligence meeting took place on May 2, 2017. Even if Defendants learned at that meeting that inVentiv had not yet secured a large sales contract, and even if Defendants learned that those contracts were important for inVentiv's business model, there were still seven months left in the year to sign one. And that prospect might have seemed entirely possible, particularly when Defendants thought that inVentiv's business was "seasonal" and driven by "end-year" sales. *See* J.A. 43, 190. Defendants thus may well have thought that inVentiv's failure to sign a large sales contract by May was not a strong predictor about its future performance; and they thus might have reasonably concluded that omitting that information did not make their earnings projections misleading.

To summarize, we may not infer, from the mere fact that Defendants conducted due diligence on inVentiv, that Defendants learned about inVentiv's failure to sign any large sales contracts, nor about any supposed centrality of those contracts to inVentiv's business model. And, even if we could infer that Defendants learned those facts in their due

14

diligence meetings, we could not thereby infer that Defendants also learned that those facts foreclosed their sunny projections.

Aside from the due diligence meetings, Plaintiffs marshal little evidence of scienter. They suggest that we may divine an inference of scienter in the "temporal proximity" between Defendants' allegedly misleadingly optimistic statements in May and July and their revelations in September and November that inVentiv was a "wild card" and that revenue would be roughly flat. And it is certainly true that the "temporal proximity between . . . allegedly false statements or omissions and the subsequent disclosure of the truth" can sometimes help support an inference of scienter. *See KBC Asset Mgmt.*, 19 F.4th at 612.

But that is only so when the temporal proximity between false and truthful statements is very close. Only then, in context, may the short time between the two statements suggest that the speaker must have known the truth when they uttered the falsity. *See, e.g.*, *Miss. Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 523 F.3d 75, 91 (1st Cir. 2008) (finding a one-week gap between claiming that a vehicle defect was "fixed" and issuing a recall "strong evidence" of scienter). Otherwise, the link between an earlier misstatement and a later revelation is "purely speculative." *See Triangle Cap.*, 988 F.3d at 752. Here, the months-long gap between the statements is too wide to support an inference of scienter. *See KBC Asset Mgmt.*, 19 F.4th at 612–13 (finding a similar gap insufficient to raise a strong inference of scienter).

Plaintiffs next ask that we infer scienter from the post-merger corporate departures and reshuffling. But executive departures are, at best, weak evidence of scienter. *Cf. id.*

15

at 609.  And given that Plaintiffs have failed to raise an inference of scienter through any other means, we decline to read anything nefarious into the leadership changes of a company in flux.  *See Triangle Cap.*, 988 F.3d at 754 ("[W]ithout allegations demonstrating [scienter more clearly] . . . we find it difficult to give this regime change any weight toward a scienter inference.").

Given the weakness of Plaintiffs' inference, the final step of the comparative analysis is easy.  Plaintiffs offer no plausible arguments for why their pleadings suggest that Defendants acted with the required mental state.  They have raised no inference of scienter.  We contrast this with the competing inference:  Defendants made optimistic projections that didn't pan out.  That is the more compelling inference.

This is all the more true because Defendants explicitly based their projections on assumptions that did not materialize.  They told investors that, for their projections to be correct, inVentiv had to "close" business "in the second half" of the year.  *See* J.A. 66. This disclosure fits with Defendants' belief that inVentiv had a seasonal business driven by end-year sales.  *See* J.A. 606 (noting that "inVentiv has historically experienced an increase in net revenues in the fourth quarter as a result of clients' increased spending at the end of the calendar year"); J.A. 695 (explaining that "[e]nd-year sales drive this business").  The more "compelling" inference is that Defendants simply expected inVentiv to sign more commercial contracts by the end of 2017 than it did—not that they intentionally or recklessly misled investors.  So the district court properly dismissed Plaintiffs' § 10(b) claim.  *See Tellabs*, 551 U.S. at 324 ("A complaint will survive . . . only

16

if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

**B.      Section 14(a) claim:  Any misrepresentations are immaterial**

To make out their § 14(a) claim, Plaintiffs must adequately allege that Defendants solicited "proxies through a proxy statement that contains false or misleading material facts or omits any material fact that leaves a proxy statement false or misleading."  *Paradise Wire & Cable Defined Ben. Pension Plan v. Weil*, 918 F.3d 312, 318 (4th Cir. 2019) (citing 17 C.F.R. § 240.14a–9(a)).  A fact—omitted or included—is material if there is a "substantial likelihood" that its disclosure or removal "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).  In other words, materiality is contextual and a fact that is material when "viewed in a vacuum" may be immaterial when "considered, as is appropriate, in a broader frame."  *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) (discussing falsity rather than materiality); *Paradise Wire*, 918 F.3d at 321–23 (applying *Omnicare*'s contextual approach to materiality).

Cautionary language included in proxy materials is part of the "total mix of information made available" to investors.  *See TSC Indus.*, 426 U.S. at 438; *Paradise Wire*, 918 F.3d at 322.  So, because materiality is contextual, it can be "negate[d]" by adequate warnings and disclaimers.  *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996).  That is, if—given those warnings—it is not "substantial[ly] likel[y]" that adding an additional truthful fact would have changed a reasonable investor's mind about their

17

investment decision, then adding that fact would not have "significantly altered" how they viewed the total mix, and that fact is thus immaterial. *See id.* at 356. So when—as here— an investor alleges that a company's growth projection was misleading because it failed to disclose additional negative information, we first consider any "cautionary language" provided before deciding whether the omitted information is material.[10] *Id.* at 358; *Paradise Wire*, 918 F.3d at 318–22.

Of course, not just any warning will do. The warnings must be "specific" and "tailored to address the alleged misrepresentation or omission." *Paradise Wire*, 918 F.3d at 319. Vague, boilerplate disclaimers will not cut it. *See In re Trump*, 7 F.3d at 371. The point is that the cautionary language stands in for the omitted information, warning the investor not to rely too heavily on, or read too deeply into, a certain proposition. For this to work, the proxy statement's warnings must directly address the alleged deficiencies in that proposition. *See Gasner*, 103 F.3d at 359. When warnings are so tailored, the reasonable investor knows not to put too much stock in the proposition. And if the proposition is later undermined by an undisclosed fact, it matters not; the investor will not

---

[10] This concept is often called the "'bespeaks caution' doctrine." *See Gasner*, 103 F.3d at 358 (collecting cases). Calling this a "doctrine" may be overselling it. *See* Donald C. Langevoort, *Disclosures That "Bespeak Caution,"* 49 Bus. Law. 481, 483 (1994) (observing that the doctrine is "more a collection of cases linked by a common phrase or quotation than a set of analytically homogenous holdings"). In this Circuit, and in others, it is really just a "shorthand" for the unexceptional observation that materiality is contextual and so can be—as a matter of law—negated by adequate warnings. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1993); *Paradise Wire*, 918 F.3d at 319.

overhaul her calculus based on bad news that she was, in essence, already primed to receive.

Here, Plaintiffs allege that the proxy materials' optimistic 2018 growth projections were misleading because they omitted the fact that inVentiv had not yet signed any large sales contracts in 2017, instead emphasizing overall drug-approval numbers. For this omission to be material, a reasonable investor would have to view the total mix of information significantly differently if told overall drug-approval numbers were not the best indicator of future commercial-sector performance and that inVentiv had not signed any large sales contracts in 2017.

But this omission is not material because Defendants included "specific warnings," "tailored to address" Plaintiffs' exact complaints. *See Paradise Wire*, 918 F.3d at 319. Plaintiffs challenge the projections because they partially relied on the underlying assumption that high drug-approval rates would lead to high commercial sector revenue. Yet Defendants specifically warned that the assumptions underlying their projections were uncertain and potentially flawed. And, while Plaintiffs complain that the projections were too optimistic because inVentiv had not yet signed any large contracts, they were specifically warned that this optimism was based on "pipeline discussions" with customers rather than finalized deals. *See* J.A. 27.

Investors were also warned that the projections may be inaccurate; that the success of inVentiv's commercial business was not assured; that inVentiv had struggled to achieve profitability and might do so again; that inVentiv's success depended on other companies' expenditure on commercialization services, which could decline; and that inVentiv was in

19

a highly competitive space which could hinder its commercial business. These specific warnings were put forth against the backdrop of a broad warning that the "combined company [could] fail to achieve the anticipated benefits of combination." J.A. 483. Given both the breadth and specificity of these warnings, Plaintiffs cannot plausibly contend that the total mix of information available to them would have been significantly altered if they had been told that overall drug-approval numbers were not the best indicator of future commercial revenue and that inVentiv had not signed a contract to provide over 100 sales-team members in the first half of 2017.

Our rejection of Plaintiffs' claim flows naturally from our holdings in both *Gasner* and *Paradise Wire*. In *Gasner*, bondholders sued a company that defaulted, claiming they would not have bought the bonds if they had been told additional adverse information about the company. *See* 103 F.3d at 356. The Court held that the omission was immaterial because the bondholders were advised there was "no guarantee" the venture would succeed and were told the uncertainty of the venture "in specific detail." *See id.* at 359. Similarly, in *Paradise Wire*, investors who voted for a merger claimed that optimistic stock-price estimates and future financial performance projections were misleading because they were undercut by undisclosed facts. 918 F.3d at 316–18. But the court determined that the omissions were immaterial because the accompanying proxy statement included adequate warning language that cautioned investors that the projections might be wrong, the underlying assumptions might be uncertain, and the merger might not be profitable. *See id.* at 322–23. Our Plaintiffs' claims mirror those in *Gasner* and *Paradise Wire* and—while the specifics of the warnings must vary from case to case to remain appropriately tailored—

20

our Defendants' cautionary language is markedly similar to the warnings that negated materiality in those cases. So the securities fraud claims fail here just as they did there.[11]

\*          \*          \*

INC Research's investors have a right to be disappointed that their company's performance did not meet its optimistic projections. But that does not mean that they also have a right to civil remedies under federal securities law. Securities fraud liability cannot be "predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road." *See Maguire Fin.*, 876 F.3d at 548. Yet that is precisely what Plaintiffs seek to do here. The district court order dismissing their case is thus

*AFFIRMED.*

---

[11] Because we affirm the district court's dismissal of Plaintiffs' § 10(b) and § 14(a) claims, we also affirm the dismissal of their § 20(a) claims. Liability under § 20(a) of the Securities Exchange Act is derivative. *See Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018). Here, Plaintiffs predicate their § 20(a) claims only on their § 10(b) and § 14(a) claims. So their § 20(a) claims cannot succeed unless Plaintiffs also succeed on either their § 10(b) or § 14(a) claims. Since both of those claims fail, so too do Plaintiffs' § 20(a) claims.